**ATK THIOKOL, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 99–440C.**

United States Court of Federal Claims.

Nov. 30, 2005.

Thomas A. Lemmer, McKenna, Long and Aldridge LLP, Denver, Colorado, for plaintiff.

Kyle E. Chadwick, United States Department of Justice, Washington D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

BRADEN, Judge.

The contribution of the nation's defense and related industries to research and development after World War II is unmatched by any other developed country. For example, in fiscal year 1990 alone, the United States Department of Defense reported that 121 defense contractors spent a total of $7.3 billion in independent research and development and related costs. *See* "Defense Industrial Base: Industry's Investment in the Critical Technologies," United States General Accounting Office Report to the Chairman of the Subcommittee on Defense Industry and Technology, Committee on Armed Services, United States Senate (GAO/NSIAD–92–4) (Jan.1992). Much of the technology and commercial products on which the public depends for basic services and security were spawned from research and development required to be performed in or derivative of contracts with the federal government. To encourage and facilitate the continuation of these benefits, Congress and the relevant government agencies developed and advanced a comprehensive and complementary set of rules governing research and development costs, contained in the Cost Accounting Standards and Federal Acquisition Regulations, to provide specific guidance to achieve uniformity and certainty regarding the accounting and reimbursement of research and development efforts—whether sponsored by a federal grant or required in the performance of a federal contract or undertaken independent of such a contract.

Despite the fact that some commentators and trial courts have suggested a need for more certainty in ascertaining whether research and development is "independent," the contractual language and conduct of the parties in the context of specific transactions continue to provide the most reliable moorings for adjudicating the proper allocation and allowability of such costs.

To facilitate a review of this Memorandum Opinion, the court has provided the following outline:

## RELEVANT FACTS

A.   Plaintiff's Launch Vehicle Motor Business Required Significant Research And Development Expenditures.
B.   Plaintiff's Castor® Program–1950–2004.
C.   Mitsubishi Heavy Industries' 1996 Interest In The Castor® IVA–XL Motor.
D.   Plaintiff's 1997–1998 Contractual Negotiations With Mitsubishi Heavy Industries.
E.   Plaintiff Incurred Costs For The Acquisition Or Fabrication Of Production Equipment.

F. The Government Determined That Plaintiff's Disclosed Cost Accounting Practices Were Compliant From 1985–1999.
G. In 1999, The Government Disputed Plaintiff's "Development Effort" And "Production Equipment" Cost Allocation For The Castor® IVA–XL Motors.

## PROCEDURAL HISTORY

## DISCUSSION

A. Jurisdiction.
B. Standards Of Review.
   1. Standard Of Review On A Motion To Dismiss–RCFC 12(b)(6).
   2. Standard Of Review On A Motion For Partial Summary Judgment–RCFC 56(c).
C. The Federal Acquisition Regulation System.
   1. The Cost Accounting Standards Govern The "Allocability" Of Costs.
   2. The Federal Acquisition Regulations Govern The "Allowability" Of Costs.
   3. Interpreting The Cost Accounting Standards And The Federal Acquisition Regulations.
D. The Court's Resolution Of Pending Motions.
   1. The Parties' Cross–Motions For Summary Judgment On Count I.
     a. The Government's Argument.
     b. Plaintiff's Argument.
     c. The Court's Resolution Of The Parties' Cross–Motions For Summary Judgment On Count I.
       1. CAS 402 Requires The Consistent Allocation Of Costs.
       2. CAS 420 Controls The Allocation Of Independent Research And Development And Bid And Proposal Costs.
         a. The "Debate" Concerning "Required In The Performance Of A Contract" Language In CAS 420.
         b. The Regulatory History Of CAS 420.
       3. Plaintiff Properly Allocated Its Independent Research And Development Costs To The 1997 Mitsubishi Heavy Industries Contract And, Therefore, Plaintiff's Development Effort Costs Should Have Been Allowed.
   2. The Parties' Cross–Motions For Summary Judgment On Count II.
     a. The Government's Argument.
     b. Plaintiff's Argument.
     c. The Court's Resolution Of The Parties' Cross–Motions For Partial Summary Judgment.
       1. CAS 404 And CAS 409 Control The Capitalization And Depreciation of Tangible Capital Assets.
       2. Plaintiff Properly Allocated The Depreciation Of Tangible Capital Assets And, Therefore, Plaintiff's "Production Equipment" Costs Should Have Been Allowed.

## CONCLUSION

## RELEVANT FACTS [1]

### A. Plaintiff's Launch Vehicle Motor Business Required Significant Research And Development Expenditures.

1. Relevant facts recited herein were derived from: Plaintiff's July 2, 1999 Complaint ("Compl."); Defendant's September 3, 2003 Motion For Summary Judgment Or, In The Alternative, For Summary Judgment Upon Counts I And II And To Dismiss Count III("Gov.Mot."); Plaintiff's January 5, 2004 Cross–Motion For Partial Summary Judgment And Opposition To Defendant's Motion For Summary Judgment ("Pl. Cross–Mot. and Opp."); the July 23, 2004 Consolidated Statement of Facts ("Con. St. of Facts"), and where the parties agreed, ("Con. St.

of Facts" ¶__ (Stip.)); and Plaintiff's July 23, 2004 Exhibits ("PX").

In addition, on July 23, 2004, Plaintiff proffered Declarations of the following individuals: Michael R. Ayers, Director of Finance (1986–1994), Vice President–Strategic Development (1994–1996); Robert Germaine, Manager–Castor® IVA–XL Program (1997–2003); Grady Jacobs, Vice President–Contracts (1988–1997), Vice President–Contracts and Finance (1997–2000); Kent Larsen, Program Manager (1990–1997), Manager–Finance (1997–2000), Cost Estimating

Since the 1950s, Plaintiff[2] manufactured aerospace products for space and defense purposes, including launch vehicle motors, munitions and speciality material products, and solid propellant rocket motors. *See* Cons.St. of Facts ¶1 (Stip.). A launch vehicle motor has: a nose cone; a pressure vessel to hold solid propellant; solid propellant; an ignition system; a "throat" at the opening of the case through which gases, produced by the burning of propellant, are emitted to achieve thrust; a nozzle to direct the thrust; and related electronics. *Id.* ¶2 (Stip.). Launch vehicle motors are expensive, require significant time to manufacture, and are not produced or sold on a "commodity" basis. *Id.* ¶5 (Stip.).

Plaintiff manufactured and sold launch vehicle motors to support the National Aeronautics and Space Administration ("NASA")'s Space Shuttle program and several significant ballistic missile programs for three decades, including: the Polaris; the Poseidon; the Trident; the Minuteman; the Small Intercontinental Ballistic Missile and Peacekeeper; the Aerospace; and the MBB/EKNO/EADS. *Id.* ¶3 (Stip.). As the federal government's commitment to the space program waned, Plaintiff had to diversify its business and began to sell launch vehicle motors to foreign governments and commercial companies including: Lockheed Martin Corporation; McDonnell Douglas Corporation; EER; Orbital Sciences Corporation; and Nissan a/k/a IHI. *Id.* ¶¶3–4 (Stip.).

The launch vehicle motor industry was and is technology driven and, to remain competitive, Plaintiff continuously had to perform research and development ("R & D") that primarily was funded internally. *See, e.g.,* Ayers Decl. ¶7; Moore Decl. ¶7; Jacobs Decl. ¶5; Larsen Decl. ¶5. In making a decision to fund R & D, Plaintiff had to keep in mind that customers do not want to pay all

R & D for a product that later may be purchased by others. *See, e.g.,* Ayers Decl. ¶8; Moore Decl. ¶8. On the other hand, if a customer funds R & D, Plaintiff may lose the ability to prohibit the use of intellectual property by competitors. *Id.* For these reasons, Plaintiff was attentive to whether the Government would recognize an R & D expenditure as an "indirect cost" that could be reimbursed under the FAR, which would allow intellectual property rights to remain in the control of Plaintiff. *See* Ayers Decl. ¶9. Of course, whether R & D could be recovered through profit was a relevant factor. *See, e.g.,* Ayers Decl. ¶10; Larsen Decl. ¶6.

R & D was generally incurred at the same time as contract performance. *See, e.g.,* Ayers Decl. ¶12; Moore Decl. ¶10; Larsen Decl. ¶8. Therefore, when a new contract began, Plaintiff accounted for R & D costs in two separate categories: "development work related to the contract and the development work not directly related to a contract." *Id.* In addition to R & D required to develop a new or modified launch vehicle motors, Plaintiff typically incurred new tooling, equipment, and facilities costs. *See, e.g.,* Ayers Decl. ¶13; Moore Decl. ¶11.

**B. Plaintiff's Castor® Program–1950–2004.**

In the 1950s, Plaintiff developed Castor® launch vehicle motors. *See* Cons.St. of Facts ¶26 (Stip.). All Castor® motors "strap-on" and are attached to a launch vehicle to provide additional lift capacity during the main propulsive force for a certain phase of flight. *Id.* A Castor® motor, combined with the necessary hardware, was known as a "booster." *Id.*

In 1990, Plaintiff began development of the Castor® IVA–XL motor, an improved version of the Castor® IVA motor for the

Analyst (2002–2004); Stephen E. Moore, Program Manager–Castor® IV Program (1995–2000), Chief Engineer for Insulation and Component Work Center (2000–2001), Director–Space and Launch Vehicle Program (2001–2004); James Ricord, Contracts Manager (1980–1988), Manager of Contracts for Strategic Operations (1988–1997), Consultant (1997–1998); Randy Sokar, Controller (1997–2004), Director of Financial Planning and Reporting (2004).

2. "Plaintiff" herein refers to: Thiokol Propulsion, a division of Cordant Technologies Inc., prior to April 2001; Alliant Techsystems Inc. ("Alliant"), a division of ATK Aerospace Group, during the period April 2001–March 2004; and ATK Thiokol, Inc., a subsidiary of Alliant, from March 2004 to date. *See* Con. St. of Facts ¶93.

McDonnell Douglas Corporation's Delta launch vehicle. *Id.* ¶ 29 (Stip.). In 1992, Plaintiff produced, test-fired, and otherwise fully qualified three Castor® IVA–XL motors at the company's Huntsville, Alabama facility. *Id.* ¶ 30 (Stip.). Plaintiff performed this work, pursuant to a contract to support McDonnell Douglas' attempt to win an upgraded Delta II launch vehicle motor contract. *Id.*

Subsequently, Plaintiff designed the Castor® IVB–XL motor that essentially was the same as the Castor® IVA–XL, except that the Castor® IVB–XL had a moveable nozzle. *See, e.g.,* Moore Decl. ¶ 18; Jacobs Decl. ¶ 11. The Castor® IVA–XL nozzle was fixed. *Id.* On March 1, 1995, Plaintiff applied for a license to export unclassified defense articles and technical data, relating to the Castor® IVA–XL and IVB–XL motors (collectively the "Castor® XL motors"), and identified 30 potential customers, including Mitsubishi Heavy Industries ("Mitsubishi") and the National Aerospace Development Agency of Japan ("NASDA–Japan"). *See* Cons.St. of Facts ¶ 33 (Stip.).

In March 1995, as part of a corporate restructuring effort, Plaintiff announced the closure of the Huntsville facility and began moving production and tooling to Utah. *Id.* ¶ 34 (Stip.). The relocation was completed at the end of 1995. *Id.* Although the existing Castor® XL motor production was merely transferred to Utah, the transfer required new and modified facilities, because the Castor® XL motors were 40 feet long—eight feet longer than any other motor then in production at Plaintiff's Utah facility. *Id.* ¶ 35 (Stip.). In addition, two technical changes and a test firing[3] were required to make the Castor® XL motors more competitive ("Development Effort"). *Id.*

The Development Effort required Plaintiff to acquire new production tooling and equipment. *Id.* The Development Effort also required that the propellant grain produce a more generic thrust force to make the Castor® XL motors also suitable for generic use. *Id.* ¶ 36 (Stip.). This change meant

that the Castor® XL motors would have to be requalified and tested to ensure that with the design change, the product continued to function within the intended parameters. *Id.* A second technical change was also necessitated, because the supplier of the nozzle materials for the Castor® XL motors no longer produced the required materials. *Id.* ¶ 37 (Stip.). In addition, the Development Effort required Plaintiff to demonstrate to other customers that the Utah facility could produce an "upgraded motor," test fire that motor, and operate at full production capability. *Id.* ¶ 38 (Stip.). This required the Plaintiff to acquire or fabricate the necessary tools and equipment, and perform facility modifications ("Production Equipment"). *Id.*

In 1995, Plaintiff submitted proposals and held technical discussions with other potential customers for the Castor® IVA–XL motor, including McDonnell Douglas, Lockheed Martin, MHI, and the United States Air Force. *Id.* ¶ 41 (Stip.). On December 22, 1998, Lockheed Martin initiated an inquiry about the Castor® IVA–XL as a strap-on booster for the Atlas IIAR. *Id.* ¶ 95 (Stip.). No sales to Lockheed Martin, however, were made. *Id.*

On April 15, 1999, Plaintiff conducted a "first article acceptance test firing" of a Castor® IVA–XL motor. *Id.* ¶ 98 (Stip.). Ten potential buyers attended this event, including representatives from the Japanese Government, Lockheed Martin, Swedish Aerospace, and Orbital Sciences Corporation. *Id.* On September 30, 1999, Plaintiff also forwarded marketing material on the Castor® IVB and Castor® IVB–XL motors to Vista Technologies, Inc. *Id.* ¶ 97 (Stip.).

As of July 23, 2004, Plaintiff had only sold Castor® IVA–XL motors to Mitsubishi. *Id.* ¶ 99 (Stip.). Plaintiff maintains the Castor® IVA–XL in production-ready status and continues to market it. *See* Moore Decl. ¶ 54.

### C. Mitsubishi Heavy Industries' Interest In The Castor® IVA–XL Motor.

In February 1996, Mitsubishi expressed an interest in purchasing the Castor® IVA–XL

---

**3.** A "test fire" is a static test of a motor mounted to a test stand in order to measure certain operating parameters. *See* PX 2.

motor for use by NASDA–Japan in the H–IIA launch vehicle. *Id.* ¶ 29. Plaintiff offered to sell Mitsubishi the Castor® IVA–XL motor, but with the understanding that the motor would be configured into a booster, using attachment hardware designed specifically for the H–IIA launch vehicle. *Id.* Plaintiff advised Mitsubishi that various nonrecurring costs relating to the Castor® IVA–XL motor, would include: 1) Development Effort, 2) Production Equipment, 3) acquisition for transportation and handling equipment for shipping motors to Japan, and 4) design of a unique means to attach the Castor® IVA–XL motor to the H–IIA launch vehicle. *Id.* Mitsubishi, however, advised Plaintiff that Mitsubishi would not pay for any nonrecurring costs that also would benefit the Castor® IVA–XL motor in the commercial market. *Id.*

In July 1996, Plaintiff's management approved expenditures to fund the Development Effort to complete the upgrade of the Castor® IVA–XL motor. *See, e.g.,* Ricord Decl. ¶¶ 5, 7; Moore Decl. ¶ 30; Jacobs Decl. ¶¶ 13, 14; Larsen Decl. ¶ 11.

On December 9, 1996, Plaintiff submitted an updated proposal to Mitsubishi for a "complete, ready to erect booster." Con. St. of Facts ¶ 46 (Stip.). In the proposal, nonrecurring contract costs were divided between: 1) contract-unique effort to adapt the Castor® IVA–XL motor to the H–IIA launch vehicle that would be paid for by Mitsubishi (the "MHI Adaptation Effort") and 2) the Castor® IVA–XL Motor Development Effort and Production Equipment that would be funded internally by Plaintiff. *See, e.g.,* Ricord Decl. ¶ 6; Moore Decl. ¶ 31; Jacobs Decl. ¶ 15; Larsen Decl. ¶ 14.

Mitsubishi requested an itemization of the price for each part of the MHI Adaption Effort that Mitsubishi would pay for under the potential contract. *See* Larsen Decl. ¶ 15. On December 16, 1996, Plaintiff responded by providing an itemized list with prices totaling $5 million for the MHI Adaption Effort. *Id.* Plaintiff anticipated that it would incur $3,968,254 in costs to perform the MHI Adaption Effort, for which

Mitsubishi would pay. *Id.* This itemization for the nonrecurring MHI Adaption Effort was consistent with Plaintiff's December 9, 1996 proposal to Mitsubishi. *Id.*

On December 19, 1996, Plaintiff submitted a "final" proposal to Mitsubishi, wherein Plaintiff would pay for the Development Effort and Production Equipment and Mitsubishi would pay for the Adaptation Effort. *See, e.g.,* Moore Decl. ¶ 33; Larsen Decl. ¶ 15(a).

## D. Plaintiff's 1997/1998 Contractual Negotiations With Mitsubishi Heavy Industries.

In early March 1997, NASDA–Japan informed Mitsubishi that NASDA–Japan had selected Mitsubishi's proposal for the H–IIA launch vehicle, utilizing Plaintiff's booster (the "H–IIA/SSB program"). *See, e.g.,* Ricord Decl. ¶ 8; Moore Decl. ¶ 36. Accordingly, Mitsubishi advised Plaintiff that "contract negotiations" regarding the Castor® IVA–XL motor and the performance of the Mitsubishi Adaptation Effort should commence. *Id.* In response, Plaintiff began to incur costs relating to the Development Effort. *Id.*

On March 28, 1997, Plaintiff and Mitsubishi negotiated a proposed Memorandum of Understanding ("MOU"), requiring Plaintiff to obtain the necessary export license, as a pre-requisite for performance. *See* Moore Decl. ¶ 37. The proposed MOU also provided that Plaintiff would perform the Mitsubishi Adaptation Effort. *Id.*

On April 2, 1997, Plaintiff submitted a letter to the Divisional Administrative Contracting Officer ("DACO")[4] regarding "Expenditure of B & P Costs in Development of Castor IVA–XL" indicating that: "[a]t this time, there is sufficient market interest in this product that a design update program is warranted to enable continued marketing and proposal activity." PX 30 at GOV 0418. Attached was an "Advance Agreement Between the United States of America and [Plaintiff] Covering the Accounting Treatment for Castor® IVA–XL Bid & Proposal Costs (the 'Advance Agreement')". *Id.* at

---

**4.** The DACO is part of the Defense Contract Management Command, an entity within the Defense Logistics Agency of the Department of Defense. *See* Compl. at 1.

GOV 0150. The Advance Agreement, in part, stated that:

> [Plaintiff] warrants that the project activities set forth in the Plan are not now, nor will they in the future be specifically identified in the statement of work of a Castor IVA–XL® solid rocket motor contract or subcontract or any other expressly stated contract requirement.

*Id.* at GOV 150, ¶ 3.

On April 17, 1997, Plaintiff set up work orders to record costs to be incurred on the Development Effort for the Castor® IVA–XL motor. *See* Cons.St. of Facts ¶ 54 (Stip.).

In June 1997, Plaintiff and Mitsubishi "agreed in principle" to a draft a "Statement of Work for the H–IIA Solid Strap-on ('SSB') Design and Integration Program" ("SOW") that included the following definitions:

> 2.0 Definitions
>
> Castor IVA–XL Solid Rocket Motor The Castor IVA–XL is a solid rocket motor *developed by* [Plaintiff] for use in the commercial space launch vehicle market place. The Castor IVA–XL is an extended length version of the Castor IVA. *[Plaintiff] is updating the design of this motor to support* the general requirement of the strap-on market.
>
> Solid Strap–On Booster (SSB) Solid Rocket Motor The SSB Motor is a component of the evolutionary development of the Japanese H–II launch vehicle system. This booster is intended to provide an additional performance upgrade over the currently planned H–IIA upgrade. The SSB will be configured using a Castor IVA–XL solid rocket motor. [Plaintiff] intends to produce the SSB in their Defense and Launch Vehicles Division located in Brigham City, Utah, USA. [Plaintiff] is contracting with MHI for the development and qualification of the SSB attachment hardware, ordnance systems, nose cone and other booster systems. This SSB hardware will transform the Castor IVA–XL into the SSB configuration.

PX 25 at THI 2393 (emphasis added).

In addition, the SOW detailed Plaintiff's requirements under the contract:

> 3.0 Requirements
>
> [Plaintiff] shall design qualify and produce hardware for the SSB configuration for MHI and the H–IIA program. [Plaintiff] shall produce the Castor IVA–XL and incorporate it into the SSB configuration. The program effort, broken into four program phases is contained below.

*Id.* at THI 2396.

The four program phases referenced in Section 3.0 Requirements related only to the SSB configuration, not the Castor® IVA–XL upgrade requirements. *See* PX 25 at A–4–9.

In July 1997, Plaintiff began to incur costs for the Development Effort for the Castor® IVA–XL motor. *See* Con. St. of Facts ¶ 58 (Stip.). Thereafter, Plaintiff and Mitsubishi continued to negotiate terms and pricing. *Id.* ¶ 59 (Stip.). On August 29, 1997, Mitsubishi issued a "Letter of Agreement" authorizing Plaintiff to proceed with the Mitsubishi Adaptation Effort, as set forth in the draft June 1997 SOW, in an amount not to exceed $4,933,500. *See, e.g.,* Ricord Decl. ¶ 10; Moore Decl. ¶ 42. On September 3, 1997, Plaintiff began to record costs under various work orders, pursuant to the August 29, 1997 "Letter of Agreement." *See* Con. St. Facts ¶ 60 (Stip.).

On November 10, 1997, the United States Department of State approved the Technical Assistance Agreement ("TAA") between Plaintiff and Mitsubishi concerning the Castor® IVA–XL motor. *Id.* ¶ 62 (Stip.). On December 15, 1997, Plaintiff and Mitsubishi identified the specific assistance and technical information that Plaintiff would be providing Mitsubishi, under the H–IIA/SSB program. *See* Moore Decl. ¶ 43.

On January 15, 1998, a Preliminary Request by Plaintiff's Propulsion Group was submitted to Plaintiff's Board of Directors requesting approval of $5,200,000 for "Castor® IVA–XL Solid Rocket Motor Tooling and Facilities." *See, e.g.,* Jacobs Decl. ¶ 16; Larsen Decl. ¶ 19. Thereafter, Plaintiff began to incur costs for the acquisition and fabrication of Production Equipment to produce the Castor® IVA–XL. *See* Con. St. of Facts ¶ 65 (Stip.). Through June 1998, Plaintiff charged $1,017,264 to work order

numbers for the Castor® IVA–XL Development Effort and $658,181 for Castor® IVA–XL Production Equipment. *Id.* ¶¶ 66–67 (Stip.).

On June 30, 1998, Mitsubishi issued a Purchase Order requiring Plaintiff to provide 28 SSBs, in accordance with a contract to be entered in September 1998. *Id.* ¶ 68 (Stip.). In response, Plaintiff opened separate work orders or charge numbers for the MHI Adaptation Effort. *Id.* ¶ 69 (Stip.). On July 6, 1998, Plaintiff also opened up a separate work order for reporting the costs of manufacturing and delivering 28 SSBs that were to be charged directly and exclusively to the Mitsubishi Contract. *Id.* ¶ 68 (Stip.). By September 1998, Plaintiff had incurred costs of $1,751,364 for the Castor® IVA–XL motor Development Effort and $1,587,353 in costs for Castor® IVA–XL Production Equipment. *Id.* ¶¶ 72–73 (Stip.).

On October 7, 1998, Plaintiff and Mitsubishi signed the "H–IIA SSB Motor Program Agreement" ("Mitsubishi Contract"). *See* Moore Decl. ¶ 47. The June 8, 1997 SOW was incorporated therein. *See* PX 25 at THI 02390 (Exhibit A of Mitsubishi Contract); *see also id.* at THI 02384 ("3–1 The scope of work to be completed by Plaintiff was specified in the Statement of Work (SOW) which is attached as Exhibit A").

The October 7, 1998 Mitsubishi Contract provided:

This agreement (Agreement) is made and entered into as of September 1, 1998, by and between Mitsubishi Heavy Industries, Ltd. (Mitsubishi) and Thiokol Propulsion, A Division of Cordant Technologies Inc. (Thiokol).

  *  *  *  *  *  *

2–1 This Agreement covers the period starting from August 29, 1997 and ending on December 31, 2005.

PX 25 at THI 02383 (Preface).

Consistent with Mitsubishi's August 29, 1997 "Letter of Agreement," the Mitsubishi Contract also provided detailed price and payment terms for the Mitsubishi Adaption Effort, but did include a price for, or require payment of, Plaintiff's Development Effort and Production Equipment costs related to upgrading the Castor® IVA–XL for the commercial market. *Id.* at THI 02384. The absence of such a price evidences Plaintiff's agreement with Mitsubishi that no part of Plaintiff's Development Effort and Production Equipment costs were required under the Mitsubishi Contract, because the parties agreed that they would be treated as indirect costs. *See* Moore Decl. ¶¶ 47–48.

Likewise, the June 16, 1997 SOW incorporated into the Mitsubishi Contract specifically required Plaintiff to perform the MHI Adaption Effort, but did not contain a specific requirement for the Development Effort and Production Equipment necessary to upgrade the Castor® IVA–XL for the commercial market. *See* PX 49 at THI 02398–02400. The absence of such a requirement further evidences Plaintiff's agreement with Mitsubishi that no part of the Development Effort and Production Equipment costs were required under the Mitsubishi Contract, because the parties agreed that they would be treated as indirect costs. *See* Moore Decl. ¶¶ 47–48.

### E. Plaintiff Incurred Costs For The Acquisition Or Fabrication Of Production Equipment.

Plaintiff's Production Equipment costs for the Castor® IVA–XL Motors consisted of: 1) production tooling, including forgings, fixtures, mandrels, jigs, lathes, cure carts, dollies, chocks, rings, rack storage, trunnions, and casting cores, 2) production equipment, including computers and trailers, and 3) facility modifications, including work platform and egress chutes. *See* Con. St. of Facts ¶ 81 (Stip.).

Since the Production Equipment fabricated or acquired and used in the production of Castor® IVA–XL motors could be sold to any buyer, it was not dedicated exclusively to the Mitsubishi Contract. *Id.* ¶¶ 82–83 (Stip.). The Production Equipment, however, did not represent all of the tooling and equipment that was used to manufacture the Castor® IVA–XL motors, since some production tooling and equipment had been transferred from Plaintiff's Huntsville Facility to Plain-

tiff's Utah facility in 1995. *Id.* ¶ 84 (Stip.).[5] Plaintiff incurred $4,928,839 in costs for the acquisition or fabrication of the Production Equipment that were depreciated, utilizing measured depreciation costs based upon time. *Id.* ¶¶ 88, 90 (Stip.). Plaintiff capitalized those costs and included them in indirect cost pools. *See* Larsen Decl. ¶ 30.

Plaintiff also acquired other equipment, including ground support and handling equipment, that was exclusively dedicated to the Mitsubishi Contract. *See* Con. St. of Facts ¶ 91 (Stip.). Plaintiff, however, did not capitalize those costs, since they were classified as direct costs of the Mitsubishi Contract. *See* Germaine Decl. ¶ 21.

### F. The Government Determined That Plaintiff's Disclosed Cost Accounting Practices Were Compliant From 1985–1999.

Because Plaintiff did and continues to do significant business with the United States, Plaintiff is required to disclose cost accounting practices relating to R & D, tooling, equipment, and facilities costs. *See* Ayers Decl. ¶ 14. Plaintiff discloses its cost accounting practices on a standard form, which requests specific information regarding Plaintiff's cost accounting practices. *See* PX 49 (Cost Accounting Standard Board Disclosure Statement—CASB DS-1 (REV 2/96)).

Plaintiff's Cost Accounting Standard Board Disclosure Statement ("CAS Disclosure Statement") requests information on how the costs of certain functions that might be direct or indirect are classified, as well as for costs that are "sometimes direct/sometimes indirect[.]" Ayres Decl. ¶ 14(b) (citing PX 49 ¶ 3.2.0).

Plaintiff's CAS Disclosure Statement provides at 3.1.0:

*Criteria for Determining How Costs are Charged to Federal Contracts or Similar Cost Objectives*

Direct costs are those which are readily, economically, and consistently identifiable to a Federal contract or similar final cost objective. Indirect costs are those in-

curred for common or joint objectives or elements of costs for which it is not economically feasible to charge direct, or those not identifiable to a requirement of a specific final cost objective but are necessary for the overall operation of the business.

Examples of application of the above criteria statement are contained in further detail under the continuation sheet pages for 2.5.0 and 3.2.1–3. . . .

*Definitions of Key Words in the Above Criteria Statement*

*Readily and Economically*—When effort required and cost of identification in relationship to the benefit to be obtained by direct identification are reasonable. . . .

\* \* \* \* \* \*

*Consistently*—When costs are charged and accounted for in a manner compatible with other costs incurred for the same purpose in like circumstances.

*Identifiable*—When costs have a causal or beneficial relationship which is clear and exclusive to one final cost objective.

*See* Ayers Decl. ¶ 14(a) (citing PX 49 at Continuation Sheet III–4).

Paragraph 3.2.3 of Plaintiff's CAS Disclosure Statement identifies design engineering and design drafting, among others, as functions that are sometimes direct and sometimes indirect and whether these costs "are charged directly or indirectly based on the criteria outlined in 3.1.0." Ayres Decl. ¶ 14(b) (citing PX 49 at Continuation Sheet III–5); *see also* PX 49 at ¶ 3.2.3.

Part IV of the CAS Disclosure Statement lists indirect costs and requests information regarding the contractor's indirect cost pools. For example, a contractor "may have several pools such as manufacturing overhead, engineering overhead, material handling overhead, etc." Ayres Decl. ¶ 14(c) (citing PX 49 at ¶ 4.1.0).

Herein, Plaintiff also disclosed the practice of including depreciation costs in the various indirect cost pools. *See* Ayers Decl. ¶ 14(d) (citing PX 49 at Continuation Sheets IV–7

---

**5.** Plaintiff classified depreciation costs of the transferred Production Equipment as indirect

costs, and the Government did not object to this practice. *See* Cons.St. of Facts ¶ 84 (Stip.).

and IV–8). Plaintiff also disclosed in this section that it incurred independent research and development ("IR & D") and bid and proposal ("B & P") costs and classified them as indirect costs. *See* Ayers Decl. ¶ 14(e) (citing PX 49 at Continuation Sheets IV–12).

Section V of the CAS Disclosure Statement lists various categories of tangible capital assets and depreciation costs, such as "building improvements," "machinery and equipment," and "tools." *See* PX 49 at ¶ 5.1.0. Plaintiff's disclosed practice was to use a "useful life based upon replacement experience adjusted by expected changes in periods of usefulness," *e.g.*, "[m]ultiple use tools are capitalized based on the criteria outlined at 5.1.0. . . . Program specific tools are charged direct to applicable contracts." Ayers Decl. ¶ 14(f) (citing PX 49 at ¶ 5.1.0(k), Continuation Sheet V–5). Items having a cost exceeding $5,000 and an estimated economic life of two years or more were capitalized and depreciated over the assets' useful life. *See* Ayers Decl. ¶ 19.

Plaintiff consistently has applied these practices for classifying costs that could be either direct or indirect. *See* Ayers Decl. ¶¶ 15, 19 (citing PX at ¶ 3.1.0). Therefore, Plaintiff classified a cost that is normally an indirect cost as a direct cost *only* when: a) a contract *specifically* required that Plaintiff incur the cost; b) the contract paid for the cost; or c) *at the time* Plaintiff incurred the cost, the cost had no reasonably foreseeable benefit to more than one cost objective. *Id.* (emphasis in original).

Pursuant to Plaintiff's disclosed accounting practices, whether the contracting party is the United States, a foreign government, or a commercial buyer is not relevant in the accounting of costs. For this reason, Plaintiff incurs IR & D, B & P, selling, and tangible capital item costs for contracts for all types of customers. Plaintiff classifies these costs as indirect and allocates them across all contracts, if the circumstances outlined above do

not justify treatment as a direct cost. *See* Ayers Decl. ¶ 16.

From 1990 through 1997, a DACO periodically reviewed Plaintiff's disclosed cost accounting practices and found such practices to be CAS compliant. *See* Cons.St. of Facts ¶ 16 (Stip.). Prior to the 1990's, Plaintiff and the Government entered a number of contracts, under which the cost of R & D necessary to the performance of a contract specifically was excluded as a direct cost, but classified as an indirect cost. *See* Ayers Decl. ¶ 18. Plaintiff has applied these cost accounting practices to other government contracts since at least 1985. *See* Con. St. of Facts ¶¶ 17–25 (discussing Plaintiff's cost accounting practices on other government contracts); *see also, e.g.*, Ayers Decl. ¶¶ 18–26; Suker Decl. ¶¶ 3–5; Jacobs Decl. ¶ 6.

For example, in February 1985, Plaintiff entered into Contract No. F04704–85–C–0046, a fixed-price incentive-type contract, with the Air Force Systems Command for a Small ICBM Stage I prototype. *See* Ayers Decl. ¶ 20. This contract required the development, design, evaluation, manufacturing and testing of a functioning prototype. *Id.* The parties agreed that the contract would not fund the development of the prototype. *Id.* (citing "PX 50 at p. 2 at Line Item 0001 (line item outlines Plaintiff's duty to perform but no comparable line item compensation)"). With the Government's knowledge and consent, these development costs were classified as indirect IR & D and B & P costs. *Id.*

Plaintiff also contracted with NASA for the production of solid rocket motors used on the Space Shuttle. *Id.* ¶ 21. With NASA's knowledge and approval, Plaintiff capitalized the costs of facilities and equipment used solely for the performance of that contract and classified the resulting depreciation costs as an indirect cost that has been allocated across Plaintiff's entire business base.[6] *Id.*

---

6. The Government asserts that this statement is "substantially inaccurate," because $9.6 million of capital items located in Plaintiff's T–97 NASA facility bear Government property numbers, signifying that they were charged directly to Government cost-reimbursement contracts. *See* Cons.St. of Facts ¶ 20 (citing GX A.). The court

does not accept this characterization, because it appears that Plaintiff properly capitalized $205 million of facilities, tooling, and equipment used to perform that contract and classified the resulting depreciation as indirect costs. *Id.* (citing Suker Decl.).

In addition, in 1990, Plaintiff capitalized the cost of certain tooling for the Castor® 120 motor to be sold to the Government and commercial customers, because the items were "multipurpose." *See* Cons.St. of Facts ¶ 21 (Stip.). The Defense Contract Audit Agency ("DCAA") initially disagreed, but ultimately accepted that the tooling was multipurpose, based upon the opinion of the DACO. *Id.* The DACO also concluded that a "tool could be considered multipurpose if there [was] any possibility that it might be used on some future program. Contracts for these programs did not have to be in place." *Id.* Thereafter, Plaintiff capitalized the costs of these tools and allocated the related depreciation costs as indirect costs over Plaintiff's entire business base. *Id.* In 1995, the DCAA again challenged Plaintiff's treatment of Castor® 120 tooling costs and referred the issue to the Air Force Office of Special Investigation ("OSI"). *See* Con. St. of Facts ¶ 23 (Stip.). In January 1996, the DACO provided OSI with a memorandum outlining the reasons why the capitalization of the Castor® 120 tooling was proper, as "hard" tooling, because Plaintiff intended to use it for development and production purposes and, therefore, had potential use to perform contracts for multiple customers. *Id.* The DACO concluded that the cost appropriately was capitalized and resulting depreciation properly classified as an indirect cost. *Id.* In December 1996, the DACO restated this position. *Id.* Thereafter, OSI concluded the investigation and no adverse action was taken against Plaintiff. *Id.*

In 1992, with respect to the ELV Castor® motor, DCAA did not question, and the DACO allowed Plaintiff's R & D costs necessary to the ultimate performance of a specific contract as B & P costs, which were allocated as indirect costs.[7] *See* Ayers Decl. ¶ 24.

In 1998, Plaintiff began participating in the Integrated High Payoff Rocket Propulsion Technology ("IHPRPT") program, requiring the fabrication of a full-scale demonstration motor, using a combination of various component technologies developed with Plaintiff's

funding. *See* Ayers ¶ 25; *see also* Con. St. of Facts ¶ 24. The product of the IHPRPT program was to be a fully assembled motor, delivered in place to the Government. *Id.* The Government provided $4 million for development, but required that Plaintiff match that funding. As Plaintiff's cover letter regarding the Phase I IHPRPT proposal pledged:

> In support of this program, Thiokol plans to accomplish all component development and related engineering design work, as well as the tooling design and manufacture, and motor static test with Thiokol's discretionary Independent (IR & D) and Bid and Proposal (B & P) funds in FY 1999 and 2000. The established cost of this effort is approximately $4 million.

*Id.* The Air Force, the DACO, and the DCAA auditors were aware and accepted Plaintiff's classification of the company's $ 4 million contribution to fund as IR & D and B & P costs and provide advanced development of the nozzle and propellant components, tool design, manufacture and motor static testing, all of which was necessary to the fabrication of the full scale demonstration motor. *Id.*

Plaintiff has claimed reliance upon the aforementioned disclosed cost accounting practices and the Government's acceptance thereof to allocate and allow costs incurred, formulate final indirect rate proposals, negotiate final indirect cost rates, and negotiate billing rates. *See* Ayers Decl. ¶ 26.

**G. In 1999, The Government Disputed Plaintiff's "Development Effort" And "Production Equipment" Cost Allocation For The Castor® IVA–XL Motors.**

On March 10, 1999, DACO issued a written Notice of Intent to Disallow Costs certain costs. *See* Ayers Decl. ¶ 34; *see also* PX 31. Specifically, this Notice disallowed: 1) $1,017,264 in Development Effort for FY 1998, 2) $1,132,624 in Development Effort for FY 1998T, 3) an estimated $1,000,000 in Development Effort for FY 1999, and 4) $5,000,000 in Production Equipment, de-

---

7. The Government "substantially agrees, except that it is the DCMA that ultimately provides 'approv[al]' of cost accounting, with *advice* from

DCAA." *See* Cons.St. of Facts ¶ 23 (emphasis in original).

scribed as "Special Tooling Costs." *See* Ayers Decl. ¶ 34; *see also* PX 31 at GOV 0329, 0333. The March 10, 1999 Notice stated that the Development Effort and Production Equipment costs were "required by and specifically benefit the [Mitsubishi] Contract, and [that] these costs should be charged to the Castor® IVA–XL program." PX 31 at GOV 0329. This was the first time that the DACO–Japan informed Plaintiff in writing that the costs of the Development Effort and the Production Equipment must be charged directly and exclusively to the Mitsubishi Contract, instead of as an indirect cost. *See* Cons.St. of Facts ¶ 109 (Stip.).

By the end of October 1999, Plaintiff incurred $3,134,249 for the Castor® IVA–XL Development Effort that was allocated to Plaintiff indirect costs pools as B & P costs but should have been allocated as indirect IR & D costs because they were not incurred in order to prepare a specific proposal.[8] *See* Con. St. of Facts ¶¶ 92–93 (Stip.). In contrast, Plaintiff incurred $5,015,915 for the Mitsubishi Adaptation Effort that was allocated directly to the Mitsubishi Contract. *Id.*

On May 10, 1999, Plaintiff submitted a certified claim and request for a contracting officer's final decision allowing its Development Effort and Production Equipment costs as indirect costs. *Id.* ¶ 110 (Stip.). On May 14, 1999, a final decision was issued denying Plaintiff's claim. *Id.* ¶ 111 (Stip.).

### PROCEDURAL HISTORY

On July 2, 1999, Plaintiff filed a three-count Complaint in the United States Court of Federal Claims that was assigned to the Honorable Lawrence M. Baskir. *See* Compl. ¶¶ 58–91. The Complaint challenges the disallowance of Plaintiff's Development Effort and Production Equipment costs under Contract Nos. NAS8–38100, PB10E9900N, F42610–94–C–0031, and DAA001–95–C–0016. *Id.* ¶ 4. Without explanation, the Complaint indicates that the parties agreed that Con-

tract No. NAS8–38100 would be the "test" contract in this dispute. *Id.* ¶ 5.

Count I alleged that because the Development Effort costs were not required in the performance of the Mitsubishi Contract and, therefore, Plaintiff is entitled to account for the Development Effort as indirect costs under Contract No. NAS8–38100 in the amount of $3,149,888. *Id.* ¶¶ 58–66.[9] Accordingly, Count I alleges that the Government's disallowance of its Development Effort costs, as direct costs of the Mitsubishi Contract, was "improper" under the FAR and CAS. *Id.* ¶¶ 62–63, 65.

Count II alleges that Plaintiff is entitled to allocate the depreciation of Production Equipment as indirect costs and that those costs should have been allowed under the "test contract." *Id.* ¶¶ 71–77. Count II alleges that the total amount that should have been allowed under all contracts was $5,000,000, but again does not indicate what portion of that amount should have been allowed under the test contract. *Id.*

Count III alleges that the Government should be estopped from disallowing Plaintiff's classification of the Development Effort and Production Equipment costs as indirect costs, because Plaintiff relied on the Government's inaction. Specifically, Plaintiff relied to its detriment on the Government's failure to issue a Notice of Intent to Disallow Costs until after Plaintiff entered into the Mitsubishi Contract on October 7, 1998. *See* Compl. ¶¶ 82–83, 86–87, 90–91. Accordingly, Count III asserts that the Government is estopped from disallowing $8,149,888 as indirect costs. *Id.* ¶ 91.

On October 15, 1999, the Government filed an Answer. On December 2, 1999, a Joint Preliminary Status Report was filed advising that the parties were unable to agree upon a settlement, but "will reevaluate settlement as an option as discovery proceeds." On January 19, 2000, the court issued a Scheduling

---

8. Plaintiff mistakenly classified the Development Effort as indirect B & P costs. *Id.* ¶ 93. Both parties, however, agree that under Plaintiff's interpretation of the applicable regulations it should have been classified as IR & D. *Id.*

9. Although Count I alleges that the total amount under all contracts that should have been allowed is $3,149,888, it does not indicate what portion of that amount should have been allowed under Contract No. NAS8–38100. *Id.* ¶ 66.

Order that set a deadline for conclusion of fact discovery by June 30, 2000, and a deadline of August 1, 2000, for Plaintiff to file any motion for summary judgment.

On May 10, 2000, at the request of the parties, the court issued a Provisional Protective Order, effective as of May 26, 2000, to establish procedures to protect against the disclosure of certain proprietary information. Subsequently, the court issued five orders [10] modifying the January 19, 2000 Scheduling Order to afford the parties an opportunity to settle. On October 19, 2001, the parties filed a Joint Status Report and Motion for Scheduling Order informing the court that the parties were unable to reach a settlement.

On December 3, 2001, following a telephone status conference, the court issued an Order that the parties complete discovery by March 1, 2002; file a Joint Status Report by April 1, 2002; and file any dispositive motions by May 1, 2002. That Order also referenced the parties' request to have the case referred to a Settlement Judge to determine if the matter is amenable to Alternative Dispute Resolution (hereinafter "ADR").

On January 23, 2002, the court granted Plaintiff's January 16, 2002 Motion to Amend to reflect that Alliant Techsystems Inc., ATK Aerospace Group, acquired Thiokol Propulsion. On April 10, 2002, a Joint Status Report advised the court that the parties tentatively were scheduled to participate in ADR on June 25 and 26, 2002 and on July 9 and 10, 2002. Those efforts, however, were unproductive.

On June 3, 2002, a Joint Status Report advised the court that the parties scheduled expert depositions to commence during the week of June 24, 2002, because of a dispute over certain documents. This resulted in the cancellation of the ADR Conference scheduled for June 25 and 26, 2002. Although unclear from the record, it appears that ADR Conference scheduled for July 9 and 10, 2002 also did not take place.

On September 20, 2002, the court issued an Order scheduling an ADR Conference for October 23 and 24, 2002. On September 25, 2002, the Government filed a Notice of Withdrawal from Alternative Dispute Resolution. On October 7, 2002, the court issued an Order canceling the ADR Conference scheduled for October 23 and 24, 2002.

On January 14, 2003, a Joint Status Report advised the court that the parties were engaging in an effort to determine the appropriateness of summary judgment and developing appropriate stipulations of fact. On that date, the parties also reported plans to inform the court of their position regarding the appropriateness of summary judgment or trial by March 18, 2003. The parties, however, were unable to reach an agreement about the relevancy or admissibility of testimony by qualified experts.

On July 8, 2003, the court issued an Order entering a schedule agreed to by both parties in a Joint Status Report and Motion for Scheduling Order that required: 1) the Government to file any Motion for Summary Judgment no later than September 15, 2003; 2) Plaintiff to file any opposition no later than November 14, 2003; 3) the Government to file any Reply on December 15, 2003; 4) Plaintiff to file any Reply no later than January 15, 2004; and 5) any Consolidated Statement of Uncontroverted Facts be filed no later than February 13, 2004. *Id.*

On August 15, 2003, this case was reassigned to the undersigned judge.

\* \* \* \* \* \*

On September 3, 2003, the Government filed a Motion For Summary Judgment Or, In The Alternative, For Summary Judgment Upon Counts I And II And To Dismiss Count III. On January 5, 2004, after receiving two extensions from the court, Plaintiff filed a Cross–Motion For Partial Summary Judgment And Opposition To Defendant's Motion For Partial Summary Judgment, together with a Consolidated Statement of Facts. On February 4, 2004, the Government filed a Reply thereto and an Opposition to Plaintiff's Cross–Motion For Partial Summary Judgment.

10. The court's Orders were filed on: July 6, 2000; October 19, 2000; January 10, 2001; March 2, 2001; and May 7, 2001.

On February 11, 2004, the National Defense Industrial Association ("NDIA") filed an *amicus curiae* brief in support of Plaintiff. The NDIA is a national organization of approximately 900 companies, many of which are members of the defense industry and routinely contract with the Government for goods and services.

On March 22, 2004, after receiving two extensions, Plaintiff filed a Reply In Support Of Its Cross–Motion For Partial Summary Judgment.

On July 14, 2004, the court granted a June 15, 2004 motion to substitute Plaintiff, ATK Thiokol, Inc., as the real party in interest, instead of Alliant Techsystems Inc. and ATK Aerospace Group.

On July 23, 2004, after two other extensions of time, the parties filed a Consolidated Statement of Facts.[11] In addition, Plaintiff filed seven Declarations to which the Government objected as "vague and general opinions, characterizations of 'Thiokol's experience,' and legal conclusions, which merely repeat opinions and conclusory assertions in the cited affidavits." *See* Cons.St. of Facts ¶ 7 (Gov't Position). The Government, however, declined to produce counter-declarations or proffer facts in rebuttal. *Id.* ¶ 6 (Pl.Reply).

On July 23, 2004 Plaintiff filed two volumes of Exhibits in support of Plaintiff's Cross–Motion For Partial Summary Judgment and Plaintiff filed an Opposition to Defendant's Motion For Partial Summary Judgment Consolidated Statement of Facts.

On September 24, 2004, the court issued an Order granting Plaintiff's August 9, 2004 Motion for Oral Argument ("TR ___"). The court held an oral argument on October 19, 2004.

On January 28, 2005, the court invited the submission of *amicus curiae* briefs from bar associations, trade and industrial associations, law professors and other interested parties by April 15, 2005. The issue on which the court requested briefing was whether the FAR (48 C.F.R. § 31, Part 2) or Cost Accounting Standard (48 C.F.R., Part

9904) required technical or development effort costs to be direct or indirect costs. Thereafter, *amicus curiae* briefs were filed by the Aerospace Industries Association, representing major manufacturers of military, commercial, and business aircraft, helicopters, aircraft engines, missiles, spacecraft, and related components and equipment, and Stephen D. Knight, an Adjunct Professor with the George Washington University School of Law, LL.M. Government Procurement Program, and Of Counsel to the firm of Smith, Pachter, McWhorter & Allen, PLC.

## DISCUSSION

### A. Jurisdiction.

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is "only a jurisdictional statute; it does not create any substantive right enforceable against the United States for money damages." *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (quoting *United States v. Testan,* 424 U.S. 392, 398, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976)). Therefore, in order to come within the jurisdictional reach of the Tucker Act, a plaintiff must identify and plead a constitutional provision, federal statute, independent contractual relationship, and/or executive agency regulation that provides a substantive right to money damages. *See Todd v. United States,* 386 F.3d 1091, 1094 (Fed.Cir.2004) ("[J]urisdiction under the Tucker Act requires the litigant to identify a substantive right for money damages against the United States separate from the Tucker Act."); *see also Roth v. United States,* 378 F.3d 1371, 1384 (Fed.Cir.2004) ("Because the Tucker Act itself does not provide a substantive cause of action, ... a plaintiff must find

---

11. The July 23, 2004 Consolidated Statement of Facts supercedes the January 5, 2004 Statement of Facts, initially filed with Plaintiff's January 5, 2004 Cross–Motion.

elsewhere a money-mandating source upon which to base a suit.").

The United States Court of Federal Claims has "jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under ... the Contract Disputes Act of 1978, including a dispute concerning ... rights in tangible or intangible property, compliance with cost accounting standards, and other nonmonetary disputes on which a decision of the contracting officer has been issued under section 6 of that Act." 28 U.S.C. § 1491(a)(2); *see Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1270 (Fed.Cir.1999) (holding that "the Tucker Act grants the United States Court of Federal Claims jurisdiction to grant non-monetary relief in connection with contractor claims, including claims requesting an interpretation of contract terms.").

The Contract Disputes Act provides that "claims" [12] relating to a contract by a contractor or the Government shall be submitted to the contracting officer for a decision and that the contracting officer's decision shall be in writing and furnished to the contractor, stating the reasons for the decision and informing the contractor of its rights thereunder. 41 U.S.C. § 605(a); *see also Alliant Techsystems*, 178 F.3d at 1267 ("A letter can be a final decision under the CDA even if it lacks the standard language announcing that it constitutes a final decision.") (citing *Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed.Cir.1990)). That Act also provides that the "contracting officer's decision on the claim shall be final and conclusive and not subject to review by any forum, tribunal, or Government agency, unless an appeal or suit is timely commenced as authorized by this chapter." 41 U.S.C. § 605(b).

The United States Court of Appeals for the Federal Circuit has "enforced the strict limits of the [Contract Disputes Act] as 'jurisdictional prerequisites to any appeal.'"

*England v. The Swanson Group, Inc.*, 353 F.3d 1375, 1379 (Fed.Cir.2004) (citing *Sharman Co. v. United States*, 2 F.3d 1564, 1569 n. 6 (Fed.Cir.1993), *overruled on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed.Cir.1995)). Accordingly, "jurisdiction over an appeal of a contracting officer's decision is lacking unless the contractor's claim is first presented to the contracting officer and that officer renders a final decision on the claim." *Swanson Group*, 353 F.3d at 1379; *see also James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541–42 (Fed.Cir.1996) ("Thus for the [United States Court of Federal Claims] to have jurisdiction under the [Contract Disputes Act], there must be both a valid claim, a term the act leaves undefined, and a contracting officer's final decision on that claim.").

In this case, there is no dispute that a contract existed between Plaintiff and the Government. *See* Cons.S. of Facts ¶ 111 (Stip.); Compl. ¶ 4; *see also Trauma Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir.1997) (establish jurisdiction, a plaintiff "must show that either an express or implied-in-fact contract underlies its claim."). In addition, on May 10, 1999, Plaintiff's claim against the Government was presented to the Contracting Officer and a Final Decision was rendered four days later on May 14, 1999. *Id.* ¶ 111 (Stip.). Accordingly, the court has determined that it has jurisdiction to adjudicate Plaintiff's claims in this case.

## B. Standards Of Review.

### 1. Standard Of Review On A Motion To Dismiss–RCFC 12(b)(6).

In ruling on a motion to dismiss, the court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (citing *Scheuer v.*

---

12. Although the Contract Disputes Act does not define "claim," that term is defined in the Federal Acquisition Regulation as "a written demand or written assertion by one of the contracting parties seeking, as a matter of right, the payment of money in a sum certain, the adjustment or interpretation of contract terms, or other relief arising under or relating to the contract." 48

C.F.R. § 2.101. For claims against the Government exceeding $100,000, the contractor must certify that: the claim is made in good faith; the supporting data is accurate and complete; and the amount requested accurately reflects the amount for which the contractor believes the Government is liable. *See* 41 U.S.C. § 605(c)(1).

*Rhodes,* 416 U.S. 232, 236–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)); *see also Sommers Oil Co. v. United States,* 241 F.3d 1375, 1378 (Fed.Cir.2001) (citations omitted) ("When reviewing a dismissal for failure to state a claim upon which relief can be granted under ... Rule 12(b)(6) ... [the court] must accept as true all the factual allegations in the complaint, and ... indulge all reasonable inferences in favor of the non-movant."). Dismissal for failure to state a claim under Rule 12(b)(6) "is proper only when a plaintiff can 'prove no set of facts in support of his claim which would entitle him to relief.' " *Adams v. United States,* 391 F.3d 1212, 1218 (Fed. Cir.2004) (quoting *Leider v. United States,* 301 F.3d 1290, 1295 (Fed.Cir.2002)); *see also* RCFC 12(b)(6).

### 2. Standard Of Review On A Motion For Partial Summary Judgment– RCFC 56(c).

On a motion for summary judgment, if there is no genuine issue as to any material fact, the moving party is entitled to judgment as a matter of law. *See Moden v. United States,* 404 F.3d 1335, 1342 (Fed.Cir.2005) ("Summary judgment is only appropriate if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."); *see also* RCFC 56(c). In the United States Court of Federal Claims, summary judgment, albeit interlocutory in nature, may be rendered on the issue of liability alone, even if a genuine issue of fact exists as to the amount of damages. *See United States v. Winstar Corp.,* 518 U.S. 839, 910, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (affirming grant of partial summary judgment on contract liability and remanding the determination of the appropriate measure or amount of damages, if any.); *see also* RCFC 56(c).

Only genuine disputes of material facts that might affect the outcome of the suit will preclude entry of summary judgment. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.... That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."). The existence of "some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment[.]" *Id.* Therefore, there is no issue for the court to adjudicate unless the nonmoving party puts forth evidence sufficient for a jury to return a verdict for that party; but "if the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

The burden of demonstrating the absence of any genuine issue of material fact is on the party moving for summary judgment. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (holding the moving party must meet its burden "by 'showing'—that is pointing out to the [trial court] that there is an absence of evidence to support the nonmoving party's case"); *see also Riley & Ephriam Constr. Co., Inc.,* 408 F.3d 1369, 1371 (Fed.Cir.2005) ("The moving party bears the burden of demonstrating the absence of a genuine issue of material fact."). A summary judgment may be made without supporting affidavits and rely "solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548. Once the moving party demonstrates the absence of a genuine issue of material fact, however, the burden shifts to the non-movant to establish the existence of a genuine issue that can only be resolved at trial. *See Novartis Corp. v. Ben Venue Laboratories,* 271 F.3d 1043, 1046 (Fed.Cir.2001) (explaining that, once the movant has demonstrated the absence of a genuine issue of material fact, "the burden shifts to the non-movant to designate specific facts showing that there is a genuine issue for trial").

Therefore, a trial court is required to resolve all doubt over factual issues in favor of

the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). And, all reasonable inferences and presumptions must be resolved in favor of the non-moving party. *See Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *see also Moden,* 404 F.3d at 1342 ("[A]ll justifiable inferences [are drawn] in favor of the party opposing summary judgment.").

The fact that both parties have moved for summary judgment does not relieve the trial court of responsibility to determine the appropriateness of summary disposition. *See Stratos Mobile Networks USA, LLC v. United States,* 213 F.3d 1375, 1379 (Fed.Cir.2000) (quoting *Prineville Sawmill Co., Inc. v. United States,* 859 F.2d 905, 911 (Fed.Cir.1988)) ("[The court] determines for itself whether the standards for summary judgment have been met."). Summary judgment will not necessarily be granted to one party or another when both parties have filed motions. *See California v. United States,* 271 F.3d 1377, 1380 (Fed.Cir.2001) ("The mere fact that the parties have cross-moved for summary judgment does not impel a grant of at least one motion[.]"). The court must evaluate each party's motion on its own merits. *Id.*

## C. The Federal Acquisition Regulation System.

The Cost Accounting Standards and the Federal Acquisition Regulations serve different functions. *See Rumsfeld v. United Technologies Corp.* 315 F.3d 1361, 1365 (Fed.Cir. 2003) ("As previous decisions of [the United States Court of Appeals for the Federal Circuit] have made clear, the Federal Acquisition Regulations (FAR) govern allowability, and CAS governs allocability of costs."); *see also Rice v. Martin Marietta Corp.,* 13 F.3d 1563, 1565–67 (Fed.Cir.1993) (discussing need to distinguish between the two concepts).

As the United States Court of Appeals for the Federal Circuit held in *Boeing N. Amer., Inc. v. Roche,* 298 F.3d 1274 (Fed.Cir.2002) (*en banc*):

> [T]he concept of allocability is addressed to the question whether a *sufficient "nexus"* exists between the cost and a government

contract. The concept of allowability is addressed to the question whether a particular item of cost should be recoverable as a matter of public "policy."

*Id.* at 1281 (citations omitted) (emphasis added).

## 1. The Cost Accounting Standards Govern The "Allocability" Of Costs.

The Defense Production Act of 1950, as amended in 1970, established an independent five-member Cost Accounting Standards Board ("CAS Board") to "promulgate cost-accounting standards designed to achieve uniformity and consistency in the cost-accounting principles followed by defense contractors and subcontractors under Federal contracts." Pub.L. No. 91–379, § 719(g), 84 Stat. 796 (Aug. 15, 1970) (codified at 50 U.S.C.A. § 2168(g)). Thereafter, the CAS Board issued nineteen Cost Accounting Standards ("CAS") that measure, assign, and allocate a variety of costs, together with regulations governing contract coverage and disclosure requirements. *See Boeing,* 298 F.3d at 1282–83.

On September 30, 1980, the CAS Board ceased operations, because Congress failed to appropriate funds. Section 719 of the Defense Production Act, however, was not repealed and the CAS, regulations and disclosure requirements survived. *See* Pub.L. 100–679, § 5, 102 Stat 4055 (Nov. 17, 1988) (establishing current CASB and indicating: "All cost accounting standards, waivers, exemptions, interpretations, modifications, rules, and regulations promulgated by the Cost Accounting Standards Board under section 719 of the Defense Production Act of 1950 (50 U.S.C.App. 2168) shall remain in effect unless and until amended, superseded, or rescinded by the Board pursuant to this section."); *see also* Karen L. Manos, GOVERNMENT CONTRACT COSTS & PRICING, 1 GC–COSTS 2:C:2. On September 30, 1987, the FAR were amended to incorporate the CAS, and rules and regulations promulgated by the original CAS Board. *See* 52 FED. REG. 35,612 (Sept. 22, 1987).

In 1988, Congress enacted Office of Procurement Policy Act Amendments to reestablish the CAS Board within the Office of

Procurement Policy of the Office of Management and Budget. *See* Pub.L. No. 100–679 § 5, 102 Stat. 4055 (Nov. 17, 1988) (codified at 41 U.S.C. § 422 (2003)). In resurrecting the CAS Board, the Senate emphasized that:

> [A]gencies, rather than the Board, should be responsible for determining the allowability of specific costs. In his testimony on S. 2215, the Comptroller General stated "We believe it is important to separate the cost allocability standards and the cost allowability principles. Allocability is an accounting issue and allowability is a procurement policy issue." The Committee agrees with this distinction. Accordingly, Section 4 assigns only allocability functions to the Board. Allowability and other similar policy issues will be addressed by ... the agencies outside the purview of the CAS Board.

S.Rep. No. 100–424 (Jul. 8, 1988), *reprinted in* 1988 U.S.C.C.A.N. 5687, 5703; *see also Allegheny Teledyne, Inc. v. United States,* 316 F.3d 1366, 1370–71 (Fed.Cir.2003) (recognizing that the CAS regulates "the allocation of costs to cost objectives, but do not regulate issue of cost allowability or contract pricing."); *see also id.* (quoting *Cost Accounting Standards Board Restatement of Objectives, Policies and Concepts* (May 1977), *reprinted in Cost Accounting Standards Guide* (CCH) ¶ 2915 (1984)) (" 'Allocability' is an accounting concept involving the ascertainment of contract cost; it results from a relationship between a cost and a cost objective such that the cost objective appropriately bears all of a portion of that cost.' ").

In 1992, the new CAS Board recodified the CAS rules and regulations reported in FAR Part 30 into 48 C.F.R. Parts 9903 and 9904.[13] *See* 57 FED. REG. 14,148 (Apr. 17, 1992), as corrected by 57 FED. REG. 34,078 (Aug. 3, 1992).

#### 2. The Federal Acquisition Regulations Govern The "Allowability" Of Costs.

The FAR were developed in accordance with the Office of Federal Procurement Poli-

cy Act of 1974, as amended by Pub.L. No. 96–83, and are the primary regulation for use by all federal agencies in their acquisition of supplies and services with appropriated funds. *See* 48 FED. REG. 42,102 (Sep. 19, 1983) (establishing the FAR); *see also* 69 FED. REG. 17,764 (Apr. 5, 2004) (providing that the FAR are promulgated by the Civilian Agency Council and Defense Acquisition Regulations Council and revising certain general cost provisions).

The FAR codified and published "uniform policies and procedures for acquisition by all executive agencies." 48 C.F.R. § 1.101. Subpart 31.2 of the FAR govern the allowability of costs after costs have been allocated to a contract, as required by the CAS. *See Boeing North American, Inc. v. Roche,* 298 F.3d 1274, 1285 (Fed.Cir.2002). The general principles of allowability include: "(1) reasonableness; (2) allocability; (3) standards promulgated by the CAS Board, if applicable; otherwise generally accepted accounting principles and practices appropriate to the particular circumstances; (4) terms of the contract; (5)[and] any limitations set forth in this subpart." 48 C.F.R. § 31.201.

Fifty-two subsections in the FAR specify the allowability of certain costs. *See, e.g.,* 48 C.F.R. § 31.205–11 (governing the allowability of depreciation costs); 48 C.F.R. § 31.205–18 (governing the allowability of IR & D and B & P costs); 48 C.F.R. § 31.205–25 (governing the allocation of manufacturing and production engineering costs); 48 C.F.R. § 31.205–40 (governing the allowability of special tooling costs).

#### 3. Interpreting The Cost Accounting Standards And The Federal Acquisition Regulations.

The United States Court of Appeals for the Federal Circuit has held if there is any conflict between the CAS and the FAR as to an issue of allocability, the CAS governs.

---

**13.** In recodifying the CAS the new CAS Board specifically indicated:

> This action ... *results only in the reestablishment of previously promulgated, and currently applicable, rules and cost accounting standards.* This rule represents an effort by the Board to

finally reconcile the existing sets of cost accounting standards previously promulgated by other bodies.

*See* 57 FED. REG. 14,148 (Apr. 17, 1992), as corrected by 57 FED. REG. 34,078 (Aug. 3, 1992) (emphasis added).

Allocability is an accounting concept involving the relationship between incurred costs and the activities or cost objectives (*e.g.*, contracts) to which those costs are charged. Proper allocation of costs by a contractor is important because it may be necessary for the contractor to allocate costs among several government contracts or between government and non-government activities.

The concept of cost allowability concerns whether a particular cost can be recovered from the government in whole or in part. Cost allocability here is to be determined under the Cost Accounting Standards ("CAS"), [48 C.F.R. Parts 9903, 9904 (2001) ]. Allowability of a cost is governed by the FAR regulations, *i.e.*, the cost principles expressed in Part 31 of the FAR and pertinent agency supplements.

Although a cost may be allocable to a contract, the cost is not necessarily allowable. We have agreed with the general proposition that "costs may be assignable and allocable under CAS, but not allowable under [FAR]."

And the FAR makes clear that "[w]hile the total cost of a contract includes all costs properly allocable to the contract, the allowable costs to the Government are limited to those allocable costs which are allowable pursuant to [FAR] part 31 and applicable agency supplements." FAR § 31.201-1(b) (2001).

*Boeing*, 298 F.3d at 1280-81 (case citations omitted); *see also id.* at 1274 (citing *United States v. Boeing Co.*, 802 F.2d 1390, 1395 (Fed.Cir.1986); *Rice v. Martin Marietta Corp.*, 13 F.3d 1563, 1565 n. 2 (Fed.Cir.1993) (holding that, if there is any conflict between the CAS and the FAR as to an issue of allocability, the CAS governs)). In other words, "allocability is simply a determination of what portions of a cost are assigned to what party, whereas allowability is a determination of whether one party may apply or

recover that cost." *Allegheny Teledyne*, 316 F.3d at 1370-71.

Although the FAR may act as a ceiling on the allowability of costs allocated in accordance with CAS, the FAR may not make "the allowability of a cost *contingent* upon use of a cost measurement, allocation and assignment technique which conflict with the requirements of CAS." *Kearfott Guidance & Navigation Corp. v. Rumsfeld*, 320 F.3d 1369, 1376 (Fed.Cir.2003) (discussing that the FAR controls allocation rather than allowability) (emphasis in original).

Where a case requires the interpretation of a FAR provision that implements a CAS, the court's "task in interpreting the meaning of these FAR provisions is ultimately to ascertain the CAS Board's intended meaning when it promulgated the CAS," because the CAS is the source for the language and authority for these provisions of the FAR. *See Perry v. Martin Marietta Corp.*, 47 F.3d 1134, 1137 (Fed.Cir.1995) (same).

Therefore, in interpreting the CAS, the court must "ascertain the [Board's] intended meaning when it promulgated the CAS." *Allegheny Teledyne Inc.*, 316 F.3d at 1373 (citing *Perry*, 47 F.3d at 1137 (interpreting FAR 52.230-3 and 52.230-4 and the CAS clauses incorporated)). This analysis begins "by first looking at the text of the relevant provisions and 'any guidance that the CAS Board has published to aid in interpretation.'" *Allegheny Teledyne*, 316 F.3d at 1373 (quoting *Perry*, 47 F.3d at 1137).[14]

Where the CAS does not provide a definition of a particular term or phrase, the United States Court of Appeals for the Federal Circuit has advised trial courts to consult dictionaries or definitions in related regulations for interpretative guidance. *See Rumsfeld v. United Technologies Corp.*, 315 F.3d 1361, 1369 –1370 (Fed.Cir.2003) ("We initially turn, therefore, to standard dictionary definitions and other pertinent regulations.") (citing *Estate of Cowart v. Nicklos Drilling Co.*,

**14.** Although an agency's interpretation of its own regulations is entitled to considerable deference, deference to the DACO's interpretation and application of the CAS and FAR in the Notice of Intent to Disallow Costs is not warranted, because the CAS and FAR are not Department of

Defense regulations. *See Perry*, 47 F.3d at 1137 (citing *Newport News Shipbuilding & Dry Dock Co. v. Garrett*, 6 F.3d 1547, 1551 (Fed.Cir.1993) (rejecting the Department of the Navy's argument that when it interprets the FAR, it is interpreting Department regulations)).

505 U.S. 469, 477, 112 S.Ct. 2589, 120 L.Ed.2d 379 (1992) (relying on dictionary definition and related statutory provisions to interpret a statute)); *see also Wis. Dep't of Revenue v. William Wrigley, Jr., Co.,* 505 U.S. 214, 223, 112 S.Ct. 2447, 120 L.Ed.2d 174 (1992) (using BLACK'S LAW DICTIONARY to interpret a statute).

CAS Board guidance includes illustrations following the test of each regulation, CAS Board interpretations, and the CAS preambles to explain regulations in "non-technical" language. *See Boeing Co. v. United States,* 862 F.2d 290 (Fed.Cir.1989) (relying on CAS 402, Interpretation No. 1); *see also Perry,* 47 F.3d at 1139 (citing 48 C.F.R. § 30.101(d) (1993) ("[Although] preambles are not regulatory[,] [they] are intended to explain why the Standards and related Rules and Regulations were written[.]"));.

## D. The Court's Resolution Of Pending Motions.

Two outstanding motions are resolved herein: the Government's September 3, 2003 Motion for Summary Judgment or, in the Alternative, for Summary Judgment Upon Counts I and II and to Dismiss Count III; and ATK Thiokol's January 5, 2004 Cross–Motion for Partial Summary Judgment and Opposition to Defendant's Motion for Partial Summary Judgment. The Court's resolution of the parties' Cross–Motions for Summary Judgment on Counts I and II renders the Government's Motion to Dismiss Count III moot.

The questions presented in the pending motions require the court to determine, as a matter of law, whether: 1) the technical and development effort that Plaintiff treated as IR & D was "required in the performance of" the Mitsubishi Contract, within the meaning of CAS 420 and FAR 32.205–18; and 2) the capitalization of tangible assets, including those necessary to produce the upgraded Castor® IVA–XL at Plaintiff's Utah facility, and subsequent allocation of the depreciation of those capitalized assets as indirect costs, were proper under CAS 404, CAS 409, and FAR 31.205–11.

## 1. The Parties' Cross–Motions For Summary Judgment On Count I.

The court's resolution of the parties' cross-motions for summary judgment on Count I depends on whether Plaintiff properly allocated $3 million in IR & D spent to upgrade the Castor® IVA–XL for the commercial market. Resolution of this issue turns on whether that expense was "required in the performance of a contract." *See* 48 C.F.R. § 9904.420; *see also* 44 FED. REG 55,123 (Sep. 25, 1979) (containing final rule with commentary).

### a. The Government's Argument.

The Government contends that Plaintiff improperly classified the Development Effort as IR & D, as "required in the performance of" the Mitsubishi Contract, because CAS 420 and FAR 31.205–18 "expressly preclude, and were always intended to preclude, accounting for costs 'required in the performance of a contract' as IR & D costs." Gov't Reply at 2. The Government argues that the "common sense, pragmatic definition" of "required in the performance of a contract," as used in CAS 420 and FAR 31.205–18, must rest on the "practical necessities of contract performance, whether or not expressly required." Gov't Reply at 2, 6; *see also* Gov't Mot. at 12. In addition, the Government insists that "reading the governing regulatory phrase, 'required in the performance of a contract,' to mean required, as a practical matter, in order to perform a contract, is consistent both with the ordinary and natural usage and with other FAR provisions discussing contract performance requirements." Gov't Reply at 6–7.

The Government also argues that the Mitsubishi Contract "unambiguously obligated [Plaintiff] to incorporate the particular features of the *post-upgrade* Castor® IVA–XL motors into the SSB motors for delivery to Mitsubishi." *See* Gov't Mot. at 14 (emphasis added). In the alternative, the Government contends that, even if "required in the performance of a contract" means explicitly required, Plaintiff's Development Effort was not IR & D because it was in fact explicitly required by the Mitsubishi Contract. *See* Gov't Reply at 5.

### b. Plaintiff's Argument.

Plaintiff counters that the "Development Effort" properly was classified as IR & D, because that effort was not "required in the performance of a contract" and, therefore, is IR & D allocable under CAS 420 and allowable under FAR 31.205–18 as an indirect cost. Pl. Cross Mot. and Op. at 15–33. Plaintiff contends that, when interpreted consistently, "definitions of direct and indirect costs, as well as the overall requirements of CAS and FAR," result in R & D effort being "required in the performance of a contract" only when a contract specifically requires "performance of the effort as shown by: (a) a specific contract line item with a price that requires the effort; (b) the contract's SOW, technical specification or other contract term specifically requires performance of the effort as part of that contract; (c) the estimated costs used to develop the contract's price include the costs of the effort; or (d) some other clear manifestation that the parties intended the R & D to be performed as part of the contract or for the contract to pay the costs. The mere fact [that] an R & D effort 'benefits,' is 'necessary to' or is 'implicitly' required by a contract is not sufficient to establish that the effort is 'required in the performance of a contract.'" Pl. Cross Mot. and Op. at 17, 18.

In the alternative, Plaintiff suggests that if this interpretation of "required in the performance of a contract" is not accepted, nevertheless, Plaintiff is entitled to summary judgment, pursuant to the doctrine *contra proferentum,* because CAS 420 and FAR 31.205–18 inherently are ambiguous and, therefore, should be construed against the Government.

### c. The Court's Resolution Of The Parties' Cross–Motions For Summary Judgment On Count I.

#### 1. CAS 402 Requires The Consistent Allocation Of Costs.

Public Law 100–679 (41 U.S.C. § 422) requires that contractors "comply with Cost Accounting Standards (CAS) and to disclose in writing and follow consistently their cost accounting practices." *See* 48 C.F.R. § 9903.01; *see also* 48 C.F.R. § 9903.202–1–9 (specifying the requirement for and composition of a CAS Disclosure Statement and providing an illustration of the Disclosure Statement Form, CASB–DS–1). CAS 402 and CAS 420 are relevant to the allocation of the Plaintiff's disputed IR & D costs in this case.

The purpose of CAS 402, initially promulgated on February 29, 1972, is to prevent double billing:

> The purpose of this standard is to require that each type of cost is allocated only once and on only one basis to any contract or other cost objective. The criteria for determining the allocation of costs to a product, contract, or other cost objective should be the same for all similar objectives. Adherence to these cost accounting concepts is necessary to guard against the overcharging of some cost objectives and to prevent double counting. Double counting occurs most commonly when cost items are allocated directly to a cost objective without eliminating like cost items from indirect cost pools which are allocated to that cost objective.

48 C.F.R. § 9904.402–20; *see also* 37 FED. REG. 4,139 (Feb. 29, 1972).

To achieve this objective, CAS 402 requires contractors also to provide certain information in CAS Disclosure Statements:

> The Disclosure Statement to be submitted by the contractor will require that he set forth his cost accounting practices with regard to the distinction between direct and indirect costs. *In addition, for those types of cost which are sometimes accounted for as direct and sometimes accounted for as indirect, the contractor will set forth in his Disclosure Statement the specific criteria and circumstances for making such distinctions[.]*

48 C.F.R. § 9904.402–50(b) (emphasis added).

Specifically, Part III—Direct v. Indirect Costs of the required CAS Board Disclosure Statement requires the completion of a continuation sheet, in the event that a contractor identifies a cost as "Sometimes direct/Sometimes indirect." *See* 48 C.F.R. § 9903.202–9 at III–1 ("If Code E, Sometimes di-

rect/Sometimes indirect, is used, explain on a continuation sheet the circumstances under which both direct and indirect allocations are made.").

The explanation provided by the contractor must comply with the requirement of CAS 402 that:

> *All costs incurred for the same purpose, in like circumstances, are either direct costs only or indirect costs only with respect to final cost objectives.* No final cost objective shall have allocated to it as an indirect cost any cost, if other costs incurred for the same purpose, in like circumstances, have been included as a direct cost of that or any other final cost objective. Further, no final cost objective shall have allocated to it as a direct cost any cost, if other costs incurred for the same purpose, in like circumstances, have been included in any indirect cost pool to be allocated to that or any other final cost objective.

48 C.F.R. § 9904.402–40 (emphasis added).

CAS 402 further provides definitions to assist parties in determining whether a cost should be allocated directly or indirectly to a contract:

> (3) *Direct cost* means any cost which *is identified* specifically with a particular final cost objective. Direct costs are not limited to items which are incorporated in the end product as material or labor. Costs identified specifically with a contract are direct costs of that contract. All costs identified specifically with other final cost objectives of the contractor are direct costs of those cost objectives.
>
> \*   \*   \*   \*   \*   \*
>
> (5) *Indirect cost* means any cost *not directly identified* with a single final cost objective, but identified with two or more final cost objectives or with at least one intermediate cost objective.

48 C.F.R. § 9904.402–30 (emphasis added).[15] Whether a cost "is identified specifically with a particular final cost objective" or "not directly identified with a single final cost objective," and, therefore, whether it is a direct or indirect cost is, determined by reference to the CAS Disclosure Statement. 48 C.F.R. § 9903.303 ("Contractors are cautioned that their disclosures must be complete and accurate; the practices disclosed may have significant impact on ways in which contractors will be required to comply with Cost Accounting Standards."); *see also* 48 C.F.R. § 9904.402–50(b) ("In essence, the Disclosure Statement submitted by the contractor, by distinguishing between direct and indirect costs, and by describing the criteria and circumstances for allocating those items which are sometimes direct and sometimes indirect, will be determinative as to whether or not costs are incurred for the same purpose.").

Interpretation No. 1 of CAS 402, originally was promulgated with CAS 402 on February 29, 1972, addresses the primacy that contract provisions serve in determining whether a cost is incurred for "the same purpose, in like circumstances:"

> (b) This interpretation deals with the way 9904.402 applies to the treatment of costs incurred in preparing, submitting, and supporting proposals. In essence, it is addressed to whether or not, under the Standard, all such costs are incurred for the same purpose, in like circumstances.
>
> (c) Under 9904.402, costs incurred in preparing, submitting, and supporting proposals pursuant to a *specific requirement of an existing contract* are considered to have been incurred in different circumstances from the circumstances under which costs are incurred in preparing proposals which do not result from such specific requirement. *The circumstances are different because the costs of preparing proposals specifically required by the provisions of an existing contract relate only*

15. Prior to April 5, 2004, there was "a subtle but important difference between CAS 402 and the FAR in defining [a] 'direct cost.' The [CAS] define[d] 'direct cost' as 'any cost which *is* identified specifically with a particular final cost objective;' whereas, the FAR define[d] 'direct cost' as 'any cost that *can be* identified specifically with a particular final cost objective.'" *See* Karen L. Manos, GOVERNMENT CONTRACT COSTS & PRICING, 1 GC–COSTS 63:B (emphasis added) (comparing 48 C.F.R. § 9904.402–30(a)(3) with the then existing FAR 31.202(a)). On April 5, 2004, however, the Civilian Agency Acquisition Council and the Defense Acquisition Regulation Council amended the FAR's definition of "direct cost" to conform to the CAS definition.

*to that contract while other proposal costs relate to all work of the contractor.*

48 C.F.R. § 9904.402–61 (emphasis added); *see also* 37 FED. REG 4139 (Feb. 29, 1972).

Interpretation No. 1, however, does not require that B & P costs "incurred in preparing, submitting, and supporting proposals pursuant to a specific requirement of an existing contract" be treated as direct costs:

> (d) This interpretation does not preclude the allocation, as indirect costs, of costs incurred in preparing all proposals. The cost accounting practices used by the contractor, however, must be followed consistently and the method used to reallocate such costs, of course, must provide an equitable distribution to all final cost objectives.

48 C.F.R. § 9904.402–61. In other words, under CAS 402 a contractor is permitted, but not required, to treat costs incurred as the result of specific contract provisions differently. *Id.*

Accordingly, under CAS 402, the definitions of "direct cost" and "indirect cost" and Interpretation No. 1, a contractor may, but is not required to, distinguish B & P costs that are "Sometimes direct/Sometimes indirect," on the basis of whether those costs are "specifically required by the provisions of an existing contract." *See Boeing*, 862 F.2d at 293 (recognizing that allocating similar costs as direct or indirect depends on whether they were incurred pursuant to a "specific requirement in an existing contract" complies with CAS 402).

Applying CAS 402 Interpretation No. 1, the United States Court of Appeals for the Federal Circuit has distinguished between costs that specifically are required by a contract and costs that are only generated by a contract. *Id.* (determining that B & P costs required to complete an existing contract, but not "specifically required," could be treated as indirect costs). In that case, Boeing was required to submit a proposal for a Phase II contract, as a requisite of a Phase I government contract. Boeing represented that the Phase I contract price only covered those proposal-preparation costs incurred during the period between receipt of the formal request for proposal and submission

of the proposal. *Id.* at 291. Accordingly, Boeing treated B & P costs during that period as "direct costs" of the Phase I contract and the balance as "indirect costs." The Government asserted that all of the B & P costs for the Phase II contract were "direct costs" of the Phase I contract, because the Phase II proposal was "specifically required" by the Phase I contract. Boeing countered that under CAS 402 Interpretation No. 1, only those costs specifically identified to the Phase I contract properly were "direct costs" of that contract. *Id.*

The United States Court of Appeals for the Federal Circuit agreed, relying on traditional contract interpretation, determining that the contracting parties intended only that the costs incurred during the period between receipt of the formal request for proposal and submission of the proposal specifically were required by the existing contract. *Id.* at 293.

Plaintiff was consistent in the allocation of IR & D as indirect costs in both government and commercial contracts unless they specifically were required by a contract. *See* Ayers Decl. ¶ 14 (same); *see also* Con. St. Of Facts at ¶¶ 17–25 (discussing Plaintiff's cost accounting practices on other government contracts); Ayers Decl. ¶¶ 18–26; Suker Decl. ¶¶ 3–5; Jacobs Decl. ¶ 6. Plaintiff's treatment of the "Development Costs" regarding the Mitsubishi was consistent with established practice.

### 2. CAS 420 Controls The Allocation Of Independent Research And Development And Bid And Proposal Costs.

In addition to complying with CAS 402, where, as here, incurred costs are related to IR & D and B & P, the allocation of those costs also must comply with CAS 420.

### a. The "Debate" Concerning "Required In The Performance Of A Contract" Language In CAS 420.

CAS 420, promulgated on September 25, 1979, and effective on March 15, 1980, governs the allocation of IR & D and B & P

costs. *See* 44 FED. REG. 30,347 (Sep. 25, 1979)(promulgating final rule with commentary). CAS 420 defines IR & D and B & P costs as follows:

> (2) Bid and proposal (B & P) cost means the cost incurred in preparing, submitting, or supporting any bid or proposal which effort is neither sponsored by a grant, *nor required in the performance of a contract.*
>
> \*    \*    \*    \*    \*    \*
>
> (6) Independent research and development means the cost of effort which is neither sponsored by a grant, *nor required in the performance of a contract,* and which falls within any of the following three areas:
>
>> (i) Basic and applied research,(ii) Development, and(iii) Systems and other concept formulation studies.

*See* 48 C.F.R. § 9904.420-30 (emphasis added).

Whereas CAS 420 controls the allocation of I & RD and B & P costs, FAR 31.205-18 controls whether IR & D and B & P costs are allowable. *See* 48 C.F.R. § 31.205-18. FAR 31.205-18 defines IR & D and B & P as follows:

> Bid and proposal (B & P) costs means the costs incurred in preparing, submitting, and supporting bids and proposals (whether or not solicited) on potential Government or non-Government contracts. The term does not include the costs of effort sponsored by a grant or cooperative agreement, or *required in the performance of a contract.*
>
> \*    \*    \*    \*    \*    \*
>
> Independent research and development (IR & D) means a contractor's IR & D cost that consists of projects falling within the four following areas: (1) Basis research, (2) applied research, (3) development, and (4) systems and other concept formulation studies. The term does not include the costs of effort sponsored by a grant or *required in the performance of a contract.* IR & D effort shall not include technical effort expended in developing and prepar-

ing technical data specifically to support submitting a bid or proposal.

48 C.F.R. § 31.205-18 (emphasis added).

Although CAS 420 and FAR 31.205-18 serve different functions, under both regulations IR & D and B & P costs do not include costs "required in the performance of a contract." Neither regulation, however, defines "required in the performance of a contract." The absence of such a definition apparently caused a "considerable debate" regarding whether only those costs that are explicitly required are excluded from the definition of IR & D and B & P or whether all costs implicitly required are excluded. *See, e.g., Mayman v. Martin Marietta Corp.,* 894 F.Supp. 218, 222 (D.Md.1995) ("[T]here is considerable debate over whether a particular task is 'required' by a contract and therefore cannot be billed to IR & D. One view is that a contractor can bill to IR & D any work not explicitly called for in the contract. An alternate view is that a contract includes everything implicitly necessary to carry it out.") (citing John W. Chierichella, "IR & D vs. Contract Effort," CP & A REPORT 3, at 8–12 (Feb.1990)); *United States v. Newport News Shipbuilding, Inc.,* 276 F.Supp.2d 539 (E.D.Va.2003) (noting the "debate"). Arguably, the "debate" is exacerbated by the fact that no decision of the United States Court of Appeals for the Federal Circuit, the United States Court of Federal Claims, nor Board of Contract Appeals has interpreted in the abstract the meaning of "required in the performance of a contract," as used in FAR 31.205-18 and CAS 420.

The Cross–Motions for Summary Judgment on Count I invite the court to resolve this long standing "debate." As a matter of law, any uncertainty regarding the proper scope of IR & D, however, ended when the CAS Board promulgated CAS 420 on September 25, 1979. *See* 44 FED. REG. 30,347 (Sep. 25, 1979) (promulgating final rule with commentary).

### b. The Regulatory History Of CAS 420.

Although the CAS Board's decision not to define "required in the performance of a contract" has provided fertile ground for ad-

vocacy regarding the allocation and allowability of IR & D costs, it is settled law that the court's proper role is to ascertain the CAS Board's meaning of "required in the performance of a contract," when CAS 420 was promulgated on September 27, 1979. *See Perry,* 47 F.3d at 1137 (holding that where a FAR implements a CAS, the sole task in is to determine the CAS Board's intent when it promulgated the CAS).

It is clear that FAR 31.205–18(b) was intended to implement and, therefore, specifically incorporates CAS 420:

(b) Composition and allocation of costs. *The requirements of 48 CFR 9904.420, Accounting for independent research and development costs and bid and proposal costs, are incorporated in their entirety* and shall apply as follows—

(1) Fully–CAS–covered contracts. Contracts that are fully-CAS-covered shall be subject to all requirements of 48 CFR 9904.420.

(2) Modified CAS-covered and non-CAS-covered contracts. Contracts that are not CAS-covered or that contain terms or conditions requiring modified CAS coverage shall be subject to all requirements of 48 CFR 9904.420 except 48 CFR 9904.420–50(e)(2) and 48 CFR 9904.420–50(f)(2), which are not then applicable. However, non-CAS-covered or modified CAS-covered contracts awarded at a time the contractor has CAS-covered contracts requiring compliance with 48 CFR 9904.420, shall be subject to all the requirements of 48 CFR 9904.420.

48 C.F.R. § 31.205–18(b)(1)(2) (emphasis added).

Although CAS 420 was not issued until 1979, the CAS Board began consideration of a Cost Accounting Standard addressing IR & D and B & P on June 20, 1972. *See* Pl. Cross–Mot and Opp. Ex. 11 ("CASB Staff Paper Independent Research and Development, Bidding and Proposal and Advance Contract Costs" (June 20, 1979)). In December, 1975, the CAS Board staff recommended the promulgation of a Cost Accounting Standard addressing IR & D and B & P costs:

## II. *NEED FOR A STANDARD*

Over the past fifteen years considerable effort has been put forth by both Government and other interested parties as to what constitutes IR & D and B & P activities and costs; how these costs should be accounted for, i.e., how they should be accumulated and allocated to cost objectives.

*The continuing discussion has resulted in a self-perpetuating flow of proposals and counter-proposals as to the best method for handling these costs.*

*Recent legislation passed by the Congress did not completely rectify the divergence in policies of DOD, NASA and AEC (ERDA) that had existed in the past.*

The Staff after having completed an exhaustive study of the subject is of the opinion that *a Standard should be promulgated to correct the many divergences in practice by both the Government and defense contractors.*

The opinion of the Staff is further supported by the Comptroller General's report on "The Feasibility of Applying Uniform Cost Accounting Standards to Negotiated Defense Contracts." (January 1970) *The Feasibility Study cited many examples of problem areas regarding the accounting for IR & D and B & P costs.* The problems related to: (1) the distinction between IR & D and B & P activities and costs, *(2) the composition of IR & D and B & P costs,* (3) the proper method for allocation of these costs on a common basis resulting in an appropriate assignment ot final cost objectives.

*See* Pl. Cross–Mot. and Opp. Ex. 15 at 3–4 ("CASB Staff Paper Identification, Composition and Allocation of Independent Research and Development (IR & D) and Bid and Proposal (B & P) Costs" (Dec.1975)) (emphasis added).

Although the CAS Board staff was aware of a number of problems with the ASPR's treatment of IR & D and B & P costs, nevertheless, they concluded that the ASPR definitions were "suitable for a cost accounting Standard without change." *Id.* at 12. Therefore, the CAS Board staff prepared a

draft CAS that incorporated in the definition of IR & D, the ASPR limitation "[t]hat technical effort which is not sponsored by, or *required in the performance of, a contract* or grant." *Id.* at 53. The draft CAS, however, did not contain a similar limitation for B & P costs. *Id.* at 51–52.

When CAS 420 was promulgated on September 25, 1979, the CAS Board intended that the definitions of IR & D and B & P would be consistent with the definitions of IR & D and B & P, as used in other agency procurement regulations. *See* 44 FED. REG. 30,347 (Sep. 25, 1979) ("The definitions of IR & D and B & P costs in the proposed Standard were intended to be consistent with those currently in use in agency procurement regulations."). Significantly, in contrast to the CAS Board staff's draft, when CAS 420 was promulgated, CAS 420 included the language that "neither sponsored by a grant, *nor required in the performance of a contract,*" not only in the definition of IR & D but also in the definition of B & P. *See* 48 C.F.R. § 9904.420 (emphasis added). Therefore, the CAS Board was aware that the meaning of *"required in the performance of a contract"* was an issue, but nevertheless elected to incorporate that limitation into both the IR & D and B & P definitions:

(1) Background

Work on the development of this Standard was initiated based on the General Accounting Office Report on the Feasibility of Applying Uniform Cost Accounting Standards to Negotiated Defense Contracts. The report referenced problem areas concerned with (1) the allocation of incurred costs to IR & D and B & P projects (2) the allocation of such costs to cost objectives, and (3) *the definition of IR & D and B & P work tasks.*

*See* 44 FED. REG. 55,123 (Sep. 26, 1979).

The "debate" about the meaning of "required in the performance of a contract"

continued when a change to the definition of IR & D was proposed. *See* Pl. Cross–Mot. and Opp. Ex. 1 at 1(ASPR 15.205–35(c) defining IR & D as "that research and development which is *not sponsored by* a contract, grant, or other arrangement." (emphasis added)). Specifically, in 1967 the ASPR Committee,[16] proposed replacing "not sponsored by" with "not sponsored by, or *in support of,* a contract or grant." *See* Pl. Cross–Mot. and Opp. Ex. 2 at 1 ("ASPR Committee 1967 draft of ASPR 15–205.35") (emphasis added); *see also* Pl. Cross–Mot. and Opp. Ex. 3 ("ASPR Committee's 1968 revised draft of ASPR 15–205.35").

The Council of Defense and Space Industry Association ("COSIA") expressed concern regarding the proposed change:

Under paragraph (a), "Definition,"of 15–205.35, we note that IR & D is ... "that technical effort which is not sponsored by, or in support of, a contract or grant ...." The words ... ", or in support of," are not in the current ASPR definition and are believed to be a source for future misrepresentation. We do not believe that the Government intends that a contractor's IR & D programs must be completely unrelated to various technologies that are also under its Government contracts. We believe that the words ...", in support of"... can be construed to preclude such related IR & D effort as an allowable cost since it may be broadly related an therefore thought to be ... ", in support of," a particular contract or grant. Because both the Government and industry clearly do not intend to have IR & D effort defined as including that specific effort required to be performed as part of the scope of a particular contract or grant, we believe that the intent can be more clearly expressed by eliminating the phrase... ", or in support of[.]"

**16.** The ASPR Committee, the predecessor to the current Defense Acquisitions Regulatory Council, was a joint tri-service committee established under the Assistant Secretary of Defense (Installations and Logistics) to monitor and develop rules affecting Department of Defense Procurement. Major Norman L. Roberts, *Private and Public International Law Aspects of Government Con-* *tracts,* MIL. L. REV., April 1967, at 1, 6 n. 6, 9. The Committee was comprised of one policy and one legal member from the Army, Navy, Air Force and Defense Supply Agency and two members appointed by the Secretary of Defense, one of whom acted as the chairman. *See* DOD Instruction No. 5126.3 (Dec. 20, 1961).

*See* Pl. Cross–Mot. and Opp. Ex. 4 at 5–6 ("CODSIA April 25, 1968 letter to ASPR"). The ASPR Committee agreed that this concern was valid and subsequently removed "in support of" from the proposed regulation. *See* Pl. Cross–Mot. and Opp. Ex. 6 at 2.

On July 20, 1971, CODSIA proposed that IR & D be defined as "that technical effort which is not sponsored by, or *specifically required by contract provisions* in performance of, a contract or grant." Pl. Cross–Mot and Opp. Ex. 9 at 1 ("CODSIA revised draft of ASPR 15–205.35") (emphasis added). The ASPR Committee, however, did not adopt CODSIA's recommendation. Instead, on September 1, 1971, the ASPR Committee published Defense Procurement Circular No. 90, amending the definition of IR & D to include "that technical effort which is not sponsored by, or required in the performance of a contract or grant." Pl. Cross–Mot. and Opp. Ex. 10 at 3 ("DPC No. 90."). Accordingly, the ASPR Committee rejected language, "in support of," that would have given the definition a broad meaning and language and adopted, "specifically required by contract provisions," to limit the phrase with a narrower meaning. More importantly, the ASPR Committee rejected language that would have reduced the role of contract interpretation in determining what is or is not "required in the performance of a contract."

The ASPR Committee also did not define "required in the performance of a contract or grant" and, thereby continued the debate over whether "required in the performance of a contract," as used in ASPR 15–205.35 excludes only costs explicitly "required in the performance of a contract" or excludes all costs implicitly "required in the performance of a contract." *See, e.g., Appeal of Gen. Dynamics Corp.,* 1966 WL 443 (A.S.B.C.A.), 66–1 BCA P 5680, ASBCA No. 10254 ("At a minimum, [ASPR 15–205.35(c) ] was intended to insure that a contractor performing research and development work would not be paid twice for its effort, *i.e.,* once under a contract covering the work directly, and a second time, in part at least, by an overhead markup resulting from research and development costs applied to all of the Government contracts which the contractor had.")

Nevertheless, the CAS Board, having determined that ASPR 15–205.35 suitable for use as a standard without change, did not define or offer an interpretation of "required in the performance of a contract," when that phrase was incorporated into the definitions of IR & D, and, more importantly, B & P when CAS 420 was promulgated. *See* 48 C.F.R. § 9904.420–30 (defining IR & D as "cost of effort which is neither sponsored by a grant, *nor required in the performance of a contract*" and B & P as cost "which is neither sponsored by a grant, *nor required in the performance of a contract*") (emphasis added). Obviously, the CAS Board did not need to promulgate a definition or interpretation of "required in the performance of a contract," because CAS 420 was not promulgated in a vacuum. *See Exxon Corp. v. United States,* 88 F.3d 968, 975 (Fed.Cir.1996) ("We nonetheless are mindful that a regulatory provision must not be read in a vacuum, but instead in light of the entire law and its object and policy.") (citing *John Hancock Mut. Life Ins. Co. v. Harris Trust & Sav. Bank,* 510 U.S. 86, 93–95, 114 S.Ct. 517, 126 L.Ed.2d 524 (1993)). In other words, CAS 420 must be read in light of the regulatory framework in which it was promulgated.

Therefore, "required in the performance of a contract" is to be interpreted in light of CAS 402, and Interpretation No. 1, thereto, since the CAS Board decided to retain both when CAS 420 was promulgated. *See Glover v. West,* 185 F.3d 1328, 1332 (Fed.Cir.1999) ("Furthermore, [courts] attempt to give full effect to all words contained within that statute or regulation, thereby rendering superfluous as little of the statutory or regulatory language as possible.") (citing *Tallman v. Brown,* 105 F.3d 613, 616 (Fed.Cir.1997); *Union Pac. Corp. v. United States,* 5 F.3d 523, 526 (Fed.Cir.1993)).

CAS 402 and Interpretation No. 1 subsequently were retained when the CAS Board recodified the CAS in 1992. *See* 57 FED. REG. 14,148 (recodifying the CAS to "provide for a single set unified set of rules and Cost Accounting Standards" as part of an effort to "finally reconcile the existing sets of cost accounting standards"). Accordingly, the CAS Board's retention of CAS 402 and

Interpretation No. 1 when it promulgated CAS 420 in 1979 was not an oversight.

More importantly, whether B & P costs arising from a specific contract are identified with that contract and, therefore, direct costs under a contractor's cost accounting practice that distinguishes direct from indirect costs on that basis, is a matter of contract interpretation. *See Boeing,* 862 F.2d at 292–93 (interpreting contract to determine whether B & P costs related to a Phase II contract proposal specifically were required by or merely generated by a Phase I contact including a Phase II proposal). Costs generated by or as a result of a contract are not considered specifically identified with the contract and, therefore, may be allocated indirectly. *Id.* The CAS Board did not intend "required in the performance of a contract" to have a static meaning independent of the contracting parties' intent; rather, consistent with CAS 402, whether a B & P cost is "required in the performance of a contract" requires a determination of the contracting parties' intent. *Id.*

Although Interpretation No. 1 specifically addresses proposal costs, nothing therein suggests that the use of the parties' intent to determine whether B & P costs were "required in the performance of a contract" should not extend to determining whether IR & D costs, which are nearly indistinguishable from B & P costs, were "required in the performance of a contract." *See* 48 C.F.R. § 9904.402–61(b) ("This interpretation deals with the way 9904.402–40 applies to the treatment of costs incurred in preparing, submitting, and supporting proposals."); *see also Aerojet–Gen. Corp. v. United States,* 215 Ct.Cl. 223, 568 F.2d 729, 731 (1977) (recognizing that IR & D costs are those costs not "directly sponsored by a contract" and explaining that IR & D and B & P costs are very similar). The CAS Board elected to limit IR & D and B & P costs with the phrase "required in the performance of a contract." Therefore, under both definitions, costs that are "required in the performance of a contract" are excluded and must be allocated directly to the contract under which they were required. On the other hand, if IR & D and B & P costs are not "required in

the performance" of a contract, they properly are allocated as indirect costs.

The retention of CAS 402 and Interpretation No. 1, therefore, clarifies that the meaning of "required the in the performance of a contact" is not fixed. Indeed, as previously noted, the ASPR Committee rejected two proposals that would have given the phrase "required in the performance of a contract" a meaning completely independent of a specific contract. Instead, whether a cost is "required in the performance of a contract" is controlled by the contracting parties' intent, as determined by traditional contract interpretation on a case-by-case basis.

3. **Plaintiff Properly Allocated Its Independent Research And Development Costs To The 1997 Mitsubishi Heavy Industries Contract And, Therefore, Plaintiff's Development Effort Costs Should Have Been Allowed.**

■ The Mitsubishi Contract clearly evidences that the parties did not intend the IR & D costs associated with upgrading the Castor® IVA–XL for the commercial market to be specifically identified with the contract.

Specifically, the October 7, 1998, Mitsubishi Contract provides:

WHEREAS [Plaintiff] desires to *sell Goods* for the H–IIA Program, and

WHEREAS MHI desires to *purchase Goods* from [Plaintiff] in conformity in all respects with the provisions stipulated herein and with the provisions referred to in or related Terms and Conditions attached hereto and subsequent purchase orders with related drawings and specifications and

WHEREAS MHI and [Plaintiff] desire to establish Contract of Goods.

\*    \*    \*    \*    \*    \*

2–4 Each of the following documents in an integral part of the Contract between MHI and [Plaintiff] and shall be binding upon both parties through the contract period.

(1) Agreement AM109–937
(2) Purchase Orders
(3) Statement of Work (SOW), Draw-     Exhibit A
    ing(s) and Specification(s)
(4) AM109–638 Special Terms and       Exhibit E
    Conditions
(5) GC–P–1225 General Terms and        Exhibit F
    Conditions
(6) MSH4506 Quality Assurance          Exhibit G
    Requirements for MHI Supplies Space
    Systems

*3.  Scope of Work*

3–1  The scope of work to be completed by [Plaintiff] is specified in the Statement of Work ("SOW"), which is attached as Exhibit A.

PX 25 at THI 2383–84 (emphasis added).

The scope of the SOW provides:

[Plaintiff] ... is a United States company specializing as a supplier of solid rocket motors, engineering, launch support hardware, and launch operation services.... [MHI] is a Japanese company that is responsible for the development, production, and integration of launch vehicles, specifically, the H–II and H–IIA for the Japanese Space Agency, NASDA. This Statement of Work (SOW) forms the basis of the work to be performed by [Plaintiff] in conjunction with and for MHI in support of the development, qualification and use of the Castor IVA–XL, as a solid strap-on booster (SSB) to the H–IIA launch vehicle.

2.0 Definitions

Castor  IVA–XL  Solid  Rocket  Motor The Castor IVA–XL is a solid rocket motor *developed by* [Plaintiff] for use in the commercial space launch vehicle market place. The Castor IVA–XL is an extended length version of the Castor IVA. *[Plaintiff] is updating the design of this motor to support* the general requirement of the strap-on market.

Solid Strap–On Booster (SSB) Solid Rocket Motor    The SSB Motor is a component of the evolutionary development of the Japanese H–II launch vehicle system. This booster is intended to provide an additional performance upgrade over the currently planned H–IIA upgrade. The SSB will be configured using a Castor IVA–XL solid rocket motor. [Plaintiff] intends to produce the SSB in their Defense and Launch Vehicles Division located in Brigham City, Utah,

USA. [Plaintiff] is contracting with MHI for the development and qualification of the SSB attachment hardware, ordnance systems, nose cone and other booster systems. This SSB hardware will transform the Castor IVA–XL into the SSB configuration.

PX 25 at THI 2393 (emphasis added)

The definition of Castor® IVA–XL Solid Rocket Motor in the SOW obligated Plaintiff to "bring to the table" the Castor® IVA–XL Solid Rocket Motor, as updated for the "strap-on market." In contrast, the contracting parties' intended costs to further "develop and qualify" that product with "attachment hardware, ordnance systems, nose cone and other booster systems," and produce a solid strap-on booster to be used with the Japanese H–II launch vehicle system specifically to be identified with the Mitsubishi Contract. In other words, the upgrade, and the associated costs, were considered a precondition to the performance of the "Adaption Effort," the cost of which the parties intended to be identified with the Mitsubishi Contract. *See* PX 25 at THI 2384, THI 3787, THI 2390; *see also* Moore Decl. ¶¶ 47–48 (discussing the drafting of specific contract provisions by the Plaintiff's to ensure that the contract did not specifically require the Development Effort).

In addition, although the Mitsubishi Contract contains a detailed price structure it does not contain a specific price for the "Development Effort," necessary to upgrade the Castor® IVA–XL for the general commercial market. Finally, the SOW incorporated into the Mitsubishi Contract and avoided any specific reference to the "Development Effort." *See* PX 25 at THI 2384, 2398–2400.

Pursuant to Plaintiff's disclosed accounting practices, IR & D costs typically are indirect costs and are allocated "as a direct cost *only* when: (a) a contract *specifically* required that Plaintiff incur the cost; (b) the contract paid for the cost; or (c) *at the time* Plaintiff incurred the cost, the cost had no reasonably foreseeable benefit to more than one cost objective." *See* Ayers Decl. ¶¶ 15, 19 (citing PX ¶ 3.1.0) (emphasis in original). That practice repeatedly was determined by the

Government to be CAS compliant. *See* Cons. St. of Facts ¶ 16 (Stip.). Since Plaintiff was required to comply with prior disclosed accounting practices, it was appropriate for Plaintiff to allocate "Development Effort" as indirect costs, because the Mitsubishi Contract did not specifically require or pay for the Development Effort, and at the time Plaintiff incurred the cost, a commercial market for the Castor® IVA–XL appeared viable. *See* 48 C.F.R. § 9903.01.

Because the Castor® IVA–XL IR & D was a pre-condition to the work "required in the performance of [the] contract," was not paid for by the Mitsubishi Contract, and a commercial market for the Castor® IVA–XL appeared viable, the court has determined that Plaintiff's allocation complied with CAS 402. Therefore, Plaintiff properly allocated $3,134,249 for updating the Castor® IVA–XL as indirect costs for fiscal years 1997 through 1999 across all contracts, both government and commercial. *See Boeing,* 862 F.2d at 293 (recognizing that costs of "benefit [to] all business of a contractor rather than a specific existing contract ... as indirect overhead is logical."). Since the Government does not contend that Plaintiff's "Development Costs" were unreasonable, therefore, the court concludes they were allowable under FAR 31.205–18(c). *See* 48 C.F.R. § 31.205–18(c) ("[C]osts for IR & D and B & P are allowable as indirect expenses on contracts to the extent that those costs are allocable and reasonable."); *see also Boeing,* 298 F.3d at 1281 (holing that a cost "may be allocable to a contract, [ ] the cost may be unallowable if it is unreasonable"). Accordingly, the Contracting Officer improperly denied Plaintiff's claim for $3,134,249.

For these reasons, the court has determined that whether IR & D costs are "required in the performance of a contract," within the meaning of CAS 420, is determined by the contracting parties' intent. Accordingly, the court declines to interpret "required in the performance of a contract" in the manner advocated by the Government, because doing so would undermine CAS 402, eliminating the primacy that the CAS Board intended the contracting parties intent to serve in the allocation of "Sometimes direct/Sometimes indirect" costs. Nor will the court interpret "required in the performance of a contract" in that manner for IR & D alone, because doing so would conflict with the identical phrase in the definition of B & P costs, required by the CAS Board's retention of CAS 402 and Interpretation No. 1, when CAS 420 was promulgated. *Cf. Voracek v. Nicholson,* 421 F.3d 1299, 1304 (Fed. Cir.2005) ("We note that similar terms used in different parts of the same statute or regulation presumptively have the same meaning.") (citing *Gustafson v. Alloyd Co.,* 513 U.S. 561, 570, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995)) (acknowledging that "identical words used in different parts of the same act are intended to have the same meaning" under the "normal rule of statutory construction" (quoting *Dep't of Revenue of Or. v. ACF Indus., Inc.,* 510 U.S. 332, 342, 114 S.Ct. 843, 127 L.Ed.2d 165 (1994))).

In addition, the Government's argument that the FAR determination of allowability governs the CAS determination of allocability directly contradicts accepted principles of construction. At the oral argument, the Government advised the court:

> GOVERNMENT'S COUNSEL: So in effect the FAR, the FAR standard, is in effect the gateway, the hurdle to get through, and if you can't get through that, then you are not even talking about IR & D in effect.

TR 6.

> \*    \*    \*    \*    \*    \*

> GOVERNMENT'S COUNSEL: [T]he CAS analysis really occurs *after you have determined that something is an allowable cost* and it belongs in that CAS category that you are dealing with. So you look at CAS 420 and reference IR & D *once you have determined that a cost is allowable. You look at CAS 420 to determine how to allocate it.* So a CAS disclosure statement presumes that the costs that it is discussing are allowable in the various categories of this discussion. Here we don't reach that because the FAR says that it is not IR & D if it is required in the performance of the contract. So you don't reach your

CAS disclosure statement because it is not even IR & D.

TR 16–17 (emphasis added).

The United States Court of Appeals for the Federal Circuit, however, has instructed trial courts the reverse analysis is required:

> [C]ost allowability may turn on whether the cost is allocable. On the other hand, even when a cost is allocable, it is not necessarily allowable.

*Boeing,* 298 F.3d at 1274. No where in this *en banc* decision does the appellate court hold that the analysis advocated by the Government in this case is proper.

### 2. The Parties' Cross–Motions For Summary Judgment On Count II.

■ The court's disposition of the parties' cross-motions for summary judgment on Count II depends on whether Plaintiff properly capitalized and allocated the cost of tangible assets necessary to produce the Castor® IVA–XL at its Utah facility, under CAS 404 and 409, and, therefore, were allowable under FAR 31.205–11.

#### a. The Government's Argument.

The Government argues that Plaintiff improperly allocated "Production Costs" as indirect costs. As an initial matter, the Government does not rely on the "special tooling" rationale used by the DACO in disallowing Plaintiff's "Production Costs." *See* Gov't Mot. at 6, 7 ("We have chosen not to rely upon the 'special tooling' rationale in this motion since CAS 420 is dispositive and there might exist factual disputes concerning how [Plaintiff] has used the Utah facility."); *see also* 48 C.F.R. § 31.205–40 (allowing special tooling, as defined by 48 C.F.R. § 45.101, and requiring such tooling to be allocated directly to the specific government contract or contracts for which it was acquired). The Government's reluctance to move for summary judgment on a "special tooling" theory appears to be based on the belief that the actual, as opposed to possible, uses to which tangible assets are put determines whether equipment is "special tooling" and, therefore, that a potential factual dispute may exist regarding the actual use of the

tangible assets at issue in this case precluding summary judgment. *Id.* Instead, the Government argues that the disputed Production Costs are R & D "required in the performance" of the Mitsubishi Contract and, therefore, under CAS 420 and FAR 31.205–18 should have been allocated as direct costs of the MHI contract. *See* Gov't Mot. at 8–17. Therefore, the Government argues that it was improper for Plaintiff to capitalize, depreciated, and allocate "Production Costs" under CAS 404 and 409 and FAR 31.205–11. *See* Gov't Reply at 20. The Government also argues that CAS 404 and 409 that govern the capitalization and subsequent depreciation of tangible capital assets, are applicable only to the extent that the Production Costs in question meet FAR 31.205–25's definition of "manufacturing and production engineering effort"("MPE"). *Id.* at 21. Here the Government's argument is that allocation of Plaintiff's Production Costs as indirect costs is contingent on those Production Costs meeting FAR 31.205–25's definition of MPE, rather than FAR 31.205–18's definition of R & D. *Id.* ("The FAR's definition of R & D and MPE are mutually exclusive."). According to the Government, Plaintiff's Production Costs are IR & D within the meaning of CAS 420 and FAR 31.205–18 and, CAS 404 and 409, do not apply. *Id.* Thus, the Government argues that Plaintiff's Production Costs are IR & D rather than MPE, because "the approximately $5 million spent by [Plaintiff] for *new* tools and other production assets" was for the "*development* of the *upgraded* Castor motor for *future* production and delivery to Mitsubishi." *Id.* at 23 (emphasis in original).

In the alternative, the Government argues that, "should [Plaintiff] choose to argue now that the upgraded Castor® IVA–XL rocket motor that Plaintiff was required to develop for delivery to Mitsubishi was not really a 'new' product," summary judgment would be precluded by "a factual dispute as to the newness of the upgraded motor." *Id.*

#### b. Plaintiff's Argument.

Plaintiff counters $4,928,839 of Production Equipment related to the acquisition of

tangible assets necessary to produce the Castor® IVA–XL was properly capitalized and depreciated and properly allocated those costs to indirect cost pools. *See* Cross Mot. at 58–64. Plaintiff's argument is based on the fact that FAR 31.205–11 requires contractors to comply with CAS 409, mandating the depreciation of tangible capital assets, as defined by CAS 404, and allocation of that depreciation as indirect costs. *See* Cross Mot. at 58–59; *see also* Pl. Reply at 27.

Plaintiff responds that the Government's argument that CAS 420 and FAR 31.205–18 control is misplaced, because those regulations are irrelevant to Production Equipment. *See* Cross. Mot. at 61 ("Government's arguments that depreciation costs must be considered direct costs because they relate to tangible assets 'necessary to,' related to, implicitly required or needed to avoid breaching a contract are irrelevant under CAS."). Plaintiff argues that the FAR and CAS treat R & D, MPE, and tangible capital assets as distinct costs, subject to different accounting procedures. *See* Pl. Reply at 27, 28.

### c. The Court's Resolution Of The Parties' Cross–Motions For Partial Summary Judgment.

### 1. CAS 404 And CAS 409 Control The Capitalization And Depreciation of Tangible Capital Assets.

CAS 404 requires contractors to "establish and adhere to policies with respect to the capitalization of tangible assets which satisfy criteria set forth [therein]." 48 C.F.R. § 9904.404–20. More importantly, CAS 404 requires the capitalization of tangible assets when these minimum criteria are met:

(b) The contractor's policy shall designate economic and physical characteristics for capitalization of tangible assets.

(1) The contractor's policy shall designate a minimum service life criterion, which shall not exceed 2 years, but which may be a shorter period. The policy shall also designate a minimum acquisition cost criterion which shall not exceed $5,000, but which may be a smaller amount.

\*      \*      \*      \*      \*      \*

(4) The contractor's policy may designate higher minimum dollar limitations for original complement of low cost equipment and for betterments and improvements than the limitation established in accordance with paragraph (b)(1) of this subsection, provided such higher limitations are reasonable in the contractor's circumstances.

\*      \*      \*      \*      \*      \*

(c) *Tangible assets shall be capitalized when both of the criteria in the contractor's policy as required in paragraph (b)(1) of this subsection are met, except that assets described in subparagraph (b)(4) of this subsection shall be capitalized in accordance with the criteria established in accordance with that paragraph.*

48 C.F.R. § 9904.404–40(emphasis added).

In addition, CAS 404 provides:

(d) Costs incurred subsequent to the acquisition of a tangible capital asset which result in extending the life or increasing the productivity of that asset (*e.g.*, betterments and improvements) and which meet the contractor's established criteria for capitalization shall be capitalized with appropriate accounting for replaced asset accountability units. However, costs incurred for repairs and maintenance to a tangible capital asset which either restore the asset to, or maintain it at, its normal or expected service life or production capacity shall be treated as costs of the current period.

48 C.F.R. § 9904.404–40.

CAS 409 authorizes the depreciation of tangible capital assets. *See* 48 C.F.R. § 9904.409–40. CAS 409 also authorizes the allocation of depreciation costs as indirect costs, unless the depreciation meets one of two exception, neither of which apply in this case:

(b) The annual depreciation cost of a tangible capital asset (or group of assets) shall be allocated to cost objectives for which it provides service in accordance with the following criteria:

(1) Depreciation cost may be charged directly to cost objectives only if such

charges are made on the basis of usage and only if depreciation costs of all like assets used for similar purposes are charged in the same manner.

(2) Where tangible capital assets are part of, or function as, an organizational unit whose costs are charged to other cost objectives based on measurement of the services provided by the organizational unit, the depreciation cost of such assets shall be included as part of the cost of the organizational unit.

(3) *Depreciation costs which are not allocated in accordance with paragraph (b)(1) or (2) of this subsection, shall be included in appropriate indirect cost pools.*

48 C.F.R. § 9904.409–40 (emphasis added).

Finally, FAR 31.205–11 provides:

(a) *Depreciation* on a contractor's plant, equipment, and other capital facilities *is an allowable contract* cost...

(b) Contractors having contracts subject to 48 CFR 9904.409, Depreciation of Tangible Capital Assets, *shall adhere to the requirement of that standard* for all fully CAS covered contracts and may elect to adopt the standard for all other contracts.

48 C.F.R. § 31.205–11 (emphasis added).

### 2. Plaintiff Properly Allocated The Depreciation Of Tangible Capital Assets And, Therefore, Plaintiff's Production Equipment Costs Should Have Been Allowed.

In this case, the production tooling (e.g., forgings, fixtures, mandrels, jigs, lathes, cure carts, dollies, chocks, rings, rack storage, trunnions and casting cores), equipment (computers and trailers) and facility modifications (e.g., work platform and egress chutes) acquired to produce the Castor® IVA–XL at Plaintiff's Utah facility and comprising Plaintiff's "Production Equipment" costs are all tangible assets. *See* Cons.St. of Facts ¶¶ 81, 85. This production tooling is considered "hard tooling," because it is usable for the production of Castor® IVA–XL motors that could be sold to any commercial customer. *Id.* ¶ 82. Similarly, the equipment and facilities modifications could be used to produce Castor® IVA–XL motors for any commercial customer. *Id.* ¶ 83.

Plaintiff determined the service life of these assets was greater than two years and the cost was greater than $5,000. *See, e.g.,* Larsen Decl. 27; Germaine Decl. ¶ 19, 20. Accordingly, in accordance with Plaintiff's capitalization policy and CAS 404, the production tooling, equipment and facilities necessary to produce the Castor® IVA–XL at the Utah facility was properly capitalized. *See* 48 C.F.R. § 9904.404–40(c); *see also* Larsen Decl. ¶¶ 24, 27. Once capitalized, Plaintiff was required to depreciate those assets and allocate that depreciation as an indirect costs in accordance with CAS 409 and FAR 31.205.11(b). *See* 48 C.F.R. § 31.205–11(b).

The court is not persuaded by the Government's argument that CAS 404 and CAS 409 are applicable only to the extent that the disputed Production Costs satisfy FAR 31.205–25's definition of "manufacturing and production engineering effort," rather than FAR 31.205–18's definition of IR & D. The Government's interpretation would make the application of CAS 404 and CAS 409 contingent upon FAR 31.205–18 and FAR 31.205–25. Such an interpretation would require the court to treat FAR 31.205–18 and FAR 31.205–25 as rules of allocation, rather than allowability. *See Kearfott Guidance & Navigation,* 320 F.3d at 1375 (Fed.Cir.2003) (discussing the invalidity of FAR acting as rules of allocation). Moreover, the Government's argument is based on the incorrect premise that Plaintiff's Production Equipment costs must be either IR & D or MPE. *See* Gov't Reply at 21 ("Costs of development effort are subject to the IR & D cost principle or the MPE cost principle, but not both."). The Government fails to recognize that under FAR 31.205–11, depreciation costs are a distinct category of allowable cost and misconstrues FAR 31.205–18's definition of "development," in an attempt to treat tangible assets as development effort. *Compare* FAR 31.205–11 (allowing depreciation costs); FAR 31.205–18 (allowing IR & D and B & P costs); FAR 31.205–25 (allowing MPE costs) *with* 48 C.F.R. § 31.205–18(a) (defining development as the "systematic use, under whatever name, of scientific and technical knowledge").

For these reasons, the court has determined Plaintiff properly allocated Production Equipment expenditures as an indirect cost. *See Boeing,* 862 F.2d at 293. The Government has not contested these costs as unreasonable. *See Boeing,* 298 F.3d at 1281. Therefore, under FAR 31.205–11, those costs were allowable. Accordingly, the Contracting Officer improperly denied Plaintiff's claim for $4,928,839.

## CONCLUSION

The Plaintiff's Cross–Motion for Partial Summary Judgment on Counts I and II is **GRANTED**. The Government's Motion for Summary Judgment or, in the Alternative, for Summary Judgment on Counts I and II and to Dismiss Count III is **DENIED**.

**IT IS SO ORDERED.**