# United States Court of Appeals for the Federal Circuit

2009-5036

ATK THIOKOL, INC. (now known as ATK Launch Systems Inc.),

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Thomas A. Lemmer, McKenna Long & Aldridge LLP, of Denver, Colorado, argued for plaintiff-appellee. With him on the brief was Phillip R. Seckman.

Robert E. Chandler, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Donald E. Kinner, Assistant Director. Of counsel on the brief was Douglas R. Jacobson, Defense Contract Management Agency, Contract Disputes Center, of Ft. Snelling, Minnesota. Of counsel was James W. Porier, Trial Attorney, of Washington, DC.

Stephen D. Knight, Smith Pachter McWhorter P.L.C., of Vienna, Virginia, for amicus curiae Committee on Government Business of Financial Executives International.

David A. Churchill, Jenner & Block LLP, of Washington, DC, for amicus curiae National Defense Industrial Association. Of counsel on the brief were Kevin C. Dwyer, Jessie K. Liu, and Michael A. Hoffman.

Appealed from: United States Court of Federal Claims

Judge Susan G. Braden

# United States Court of Appeals for the Federal Circuit

2009-5036

ATK THIOKOL, INC. (now known as ATK Launch Systems Inc.),

Plaintiff-Appellee,

v.

UNITED STATES,

Defendant-Appellant.

Appeal from the United States Court of Federal Claims
in 99-CV-440, Judge Susan G. Braden.

_____

DECIDED: March 19, 2010

_____

Before BRYSON, ARCHER, and MOORE, <u>Circuit Judges.</u>

BRYSON, <u>Circuit Judge</u>.

I

ATK Thiokol, Inc., manufactures rocket motors for government and commercial buyers. One of its products is the Castor family of solid rocket motors, which are "strap-on" motors designed to attach to a launch vehicle and provide additional thrust. In the 1990s, ATK began developing the Castor IVA-XL rocket. In 1995, ATK announced that it was closing the Huntsville, Alabama, plant where it had previously built the Castor IVA-XL motor. At that time, ATK analyzed each of the products made by the Huntsville plant as part of a corporate restructuring effort. ATK determined that there was a

market for the Castor IVA-XL motor and that the motor would be more competitive if it were upgraded. Specifically, ATK decided to make technical changes to the motor's design and test fire the motor. The parties refer to those steps as the "Development Effort." ATK moved production of the Castor IVA-XL motor to its Utah facility in 1995. From 1995 through 1999, ATK marketed the upgraded motor to various potential customers, including McDonnell Douglas, Lockheed Martin, and the U.S. Air Force.

In February 1996, the Japanese company Mitsubishi Heavy Industries expressed interest in purchasing modified Castor IVA-XL motors for Japanese government launch vehicles. While Mitsubishi was willing to pay for adapting and attaching the motors to the launch vehicles, it refused to pay for the more general, nonrecurring work associated with upgrading the Castor IVA-XL motor, in particular the Development Effort. On June 8, 1997, Mitsubishi executed a Statement of Work with ATK. The Statement of Work required ATK to deliver the motor that ATK was updating "to support the general requirements of the strap-on market." ATK began the Development Effort in July 1997. In October 1998 ATK and Mitsubishi executed a final contract for the purchase. The contract provided for a lump-sum payment for each upgraded motor and a price for modifying each motor to fit to the Japanese launch vehicles. There was no provision for payment of the Development Effort costs.

ATK accounted for the Development Effort costs as indirect independent research and development ("IR&D") costs and disclosed them as such in a proposed advance agreement submitted in 1997 to a U.S. Defense Department Divisional Administrative Contracting Officer ("DACO"). The effect of including particular charges as indirect IR&D costs is that the charges are allocated to all of the contractor's

contracts for the year, including government contracts. ATK's consistent and disclosed accounting practice was to treat research and development costs as indirect costs unless (1) the particular contract in question specifically required that ATK incur the cost; (2) the contract paid for the cost; or (3) the cost had no reasonably foreseeable benefit to more than one cost objective. From 1990 through 1997, the Defense Department had periodically reviewed that accounting practice and found it to be in accordance with the accounting regulations applicable to government contractors.

In March 1999, however, the DACO issued a notice of intent to disallow the cost of the Development Effort for the upgraded Castor IVA-XL motor by removing that cost from the category of indirect IR&D. The DACO noted that the definition of IR&D in the Federal Acquisition Regulation ("FAR") excludes efforts "required in the performance of a contract." The DACO reasoned that, because the upgrade cost was necessary to the performance of the Mitsubishi contract, the Development Effort did not qualify as IR&D and that it had to be charged, if at all, directly to the Mitsubishi contract.

ATK filed an action in the Court of Federal Claims, arguing that the DACO's refusal to treat the Development Effort costs as indirect IR&D was improper. The court found that ATK and Mitsubishi did not intend to include the Development Effort costs among the costs paid for under the contract, that the commercial market for the upgraded Castor motor appeared viable, that the allocation of the Development Effort costs to indirect IR&D was in accordance with ATK's disclosed accounting practices, and that the government had not contended that the Development Effort costs were unreasonable. ATK Thiokol, Inc. v. United States, 68 Fed. Cl. 612, 640-41 (2005). Based on those findings, and after reviewing the pertinent FAR provisions, the

corresponding sections of the Cost Accounting Standards ("CAS"), and the regulatory history of those provisions, the court held that the Development Effort costs were chargeable as indirect IR&D. Id. at 641. The government appeals from that decision.

II

Whether particular research and development costs qualify as indirect IR&D for purposes of government contract accounting is determined by several interrelated regulations. First, section 402 of the Cost Accounting Standards, 48 C.F.R. § 9904.402 ("CAS 402"), defines direct and indirect costs. A "direct cost" is "any cost which is identified specifically with a particular final cost objective"; an "indirect cost" is "any cost not directly identified with a single final cost objective, but identified with two or more final cost objectives, or at least one intermediate cost objective." CAS 402-30(a)(3), (4). CAS 402 gives the contractor considerable freedom in the classification of particular costs, so long as the contractor maintains consistency in making that determination. See CAS 402-20; see also Boeing Co. v. United States, 862 F.2d 290, 292-93 (Fed. Cir. 1988).

Second, two parallel regulations determine whether certain costs qualify as IR&D. A provision of the Federal Acquisition Regulation, 48 C.F.R. § 31.205-18 ("FAR 31.205-18"), determines whether particular costs are allowable IR&D charges. A provision of the Cost Accounting Standards, 48 C.F.R. § 9904.420 ("CAS 420"), determines whether those costs are allocable to the particular contract in question. Both the FAR and the CAS define IR&D as excluding costs that are "required in the performance of a contract." FAR 31.205-18(a); CAS 420-30(a)(6).

In light of the language and interpretation of CAS 402, it was appropriate for ATK to treat the Development Effort costs at issue in this case as indirect costs. First, those costs were not specifically required by the Mitsubishi contract. Second, as the trial court found, ATK had a disclosed and established cost accounting practice of charging as indirect costs those costs that were not paid for or required by a particular contract and that had a reasonably foreseeable benefit to more than one contract.

While we conclude that it was proper for ATK to treat its Development Effort costs as indirect, that does not end the inquiry, because the distinction between IR&D and other research and development costs does not invariably track the distinction between direct and indirect costs. For example, depending on a contractor's disclosed or established cost accounting practices, the contractor may treat some research and development costs as indirect costs because they benefit an entire product line, even if they are expressly required by a particular contract and thus would not qualify as IR&D. See 1 Karen L. Manos, Government Contract Costs & Pricing § 25:6, at 396 (2009).

As the trial court's analysis makes clear, however, the costs at issue in this case qualify as IR&D costs. The dispute over that issue focuses principally on the meaning of the phrase "required in the performance of a contract" in the definition of IR&D. The scope of that phrase has been a subject of controversy in the government contracts community since 1971, when it first appeared as part of the definition of IR&D in the Armed Services Procurement Regulation ("ASPR"), a predecessor to the FAR.[1] The government interprets the phrase to mean that IR&D costs do not include the costs of

---

[1] In 1978, the ASPR was redesignated as the Defense Acquisition Regulation ("DAR"). The DAR definition of IR&D costs was essentially the same. The FAR replaced the DAR in 1984 without any change to the definition of IR&D.

efforts that are either explicitly or implicitly required in order to complete a contract. Under that interpretation, the Development Effort costs would be deemed to be "required in the performance of" the Mitsubishi contract because that contract could not have been performed if ATK had not conducted the background research and development work to upgrade the Castor IVA-XL motor. ATK, by contrast, interprets the phrase to be limited to costs that are explicitly required by the contract. Under that interpretation, the Development Effort costs would not be deemed "required in the performance of" the Mitsubishi contract because there was no explicit requirement in the contract that obligated ATK to undertake the Development Effort or provided for payment of the Development Effort costs.

The government argues that the phrase that excludes costs from the category of IR&D must be construed broadly because it does not simply exclude costs "required by a contract," but uses broader language, excluding costs "required in the performance of a contract." Thus, the government contends that the words "in the performance of a contract" indicate that the focus is on whether the research and development work was necessary to perform the contract, not whether the work was expressly required by the contract. The government relies heavily on the district court decision in United States v. Newport News Shipbuilding, Inc., 276 F. Supp. 2d 539 (E.D. Va. 2003), which adopted that interpretation. ATK, on the other hand, contends that the term "required" must refer to a requirement of the contract. According to ATK, if the drafters of the regulation had intended to include research and development costs that were needed but not expressly included as a contract requirement, they would have used a word such as "necessary" rather than the word "required."

We do not find either textual argument particularly persuasive. Standing alone, the language of the regulation is ambiguous. See United States ex rel. Mayman v. Martin Marietta Corp., 894 F. Supp. 218, 222 (D. Md. 1995) (noting the "considerable debate" over whether "a contractor can bill to IR&D any work not explicitly called for in the contract" or whether the contractor may not bill to IR&D anything "implicitly necessary to carry it out"); John W. Chierichella, IR&D vs. Contract Effort, in 90-2 Gov't Contract Costs, Pricing & Accounting Report 8 (Feb. 1990) (noting "sustained intra-Governmental debate and confusion" over whether research and development effort not specified or directly funded by a contract may be disallowed as IR&D because it is deemed "implicitly" necessary).

Both parties invoke the regulatory history for support. Like the text, however, the regulatory history is inconclusive.[2] Prior to the 1971 amendment that added the disputed language, the applicable regulation defined IR&D as "research and development which is not sponsored by a contract, grant, or other arrangement." The "ASPR committee," which was responsible for adopting changes to the ASPR, suggested changing the definition to cover "technical effort which is not sponsored by, or in support of a contract, grant, or other arrangement." Representatives of the defense and space industries objected that the words "in support of" were too broad and would be a potential "source for future misinterpretation." The ASPR committee acknowledged that the point was "a valid objection" and altered the language by inserting "required in performance of" in place of the phrase "in support of." The

---

[2] The trial court's opinion contains a thorough and well-documented review of the regulatory history. 68 Fed. Cl. at 635-39. We have merely summarized the pertinent points here.

committee explained that the purpose of the change was "to convey the concept that any work which must be accomplished in order to fulfill contractual requirements is a contract cost. Other similar type effort may be and should be expected to be performed" as IR&D. The industry representatives then suggested further clarifying the definition by adding the words "specifically required by contract provisions" before the words "in performance of a contract." The ASPR committee, however, rejected that suggestion. The Comptroller General subsequently suggested that the exclusion from the definition of IR&D was too narrow and that the exclusion should be amended to include "technical effort implicitly required to fulfill a purchaser's requirement under terms of a contract." A Department of Defense representative, however, took a position contrary to that of the Comptroller General, urging that the exclusion from IR&D should be understood to turn on "whether the effort was specified as a deliverable requirement of an existing contract." The ASPR committee declined to make any further change in the pertinent regulatory language.

This sequence of events is not particularly instructive as to the meaning of the regulatory definition. Although the ASPR committee declined the industry's suggestion to limit the exclusion from IR&D to costs "specifically required" by the contract, it also declined the Comptroller General's suggestion to broaden the exclusion to include costs "implicitly required" by the contract. When the Board responsible for the Cost Accounting Standards ("the CAS Board") promulgated CAS 420 in 1979, it incorporated in its definition of IR&D the same language that was used in the FAR—"required in the performance of a contract." The CAS Board did not offer any explanation as to the

intended meaning of that phrase, and there has been no change in the pertinent regulatory language since then. The regulatory history is thus inconclusive.

While we find the regulatory language and history to be of little help in discerning the meaning of the phrase "required in the performance of a contract," we agree with the trial court and ATK that the meaning of that phrase in the definition of IR&D must be the same as the meaning of the identical phrase in the definition of bid and proposal ("B&P") costs. B&P costs are defined to mean costs incurred in preparing, submitting, and supporting bids and proposals, but not to include the costs of effort "required in the performance of a contract." FAR 31.205-18(a); CAS 420-30(a)(2). B&P costs are addressed in the same regulations that govern IR&D costs and are treated similarly to IR&D costs in all pertinent respects. See generally FAR 31.205-18; CAS 420-30. B&P costs "benefit all business of a contractor rather than a specific existing contract [and thus] treating all such costs as indirect overhead is logical." Boeing, 862 F.2d at 293.

A provision of CAS 402, referred to as Interpretation No. 1, supplies important guidance as to when proposal costs constitute B&P and when they are chargeable against a single contract. It provides, in pertinent part:

> [C]osts incurred in preparing, submitting, and supporting proposals pursuant to a specific requirement of an existing contract are considered to have been incurred in different circumstances from the circumstances under which costs are incurred in preparing proposals which do not result from such specific requirements. The circumstances are different because the costs of preparing proposals specifically required by the provisions of an existing contract relate only to that contract while other proposal costs relate to all work of the contractor.

CAS 402-61(c), 48 C.F.R. § 9904.402-61(c). Interpretation No. 1 distinguishes proposal costs that are "specifically required by" an existing contract from those that "do not result from such specific requirements." The former costs "relate only to [a particular]

contract," while the latter costs "relate to all work of the contractor" and thus qualify as B&P. The effect of Interpretation No. 1 is to equate the B&P definitional exclusion of proposal costs that are "required in the performance of a contract" with the category of costs that are "specifically required by the provisions of a contract."

In Boeing, this court held, based in part on Interpretation No. 1, that proposal costs that are not specifically required by a contract are "properly allocated as indirect B&P costs." 862 F.2d at 293. As part of its analysis, the court noted that proposal costs that are "specifically required by an existing contract are incurred in circumstances different from proposal costs relative to all work of the contractor." Id. The court ruled that it would be legal error to require like accounting for B&P costs that are "relate[d] to" or "caused or generated by" a contract, and those proposal costs that are "specifically required" by a contract. Id. at 292-93.

The same analysis applies to the closely analogous category of IR&D costs. Although Interpretation No. 1 does not by its terms address IR&D, the government's suggestion that the approach employed in Interpretation No. 1 should be limited to B&P costs, and that IR&D costs should be treated differently, would result in a construction in which identical regulatory language—"required in the performance of a contract"—would be interpreted differently for IR&D than for B&P. There is no support anywhere in the text or history of the regulations for treating that identical regulatory formulation differently. We therefore construe the reference to costs "required in the performance of a contract" to mean, in both contexts, costs that are specifically required by the contract.

The government argues that we should be skeptical of accepting such a result because it is contrary to sound procurement policy. In particular, the government

argues that allowing a government contractor to charge to an indirect IR&D account those research costs that are necessary to complete a commercial contract but not paid for in that contract will invite a contractor to "game the system" by shifting commercial contract costs to the government.

We are not persuaded by the government's policy argument. First, the purpose of IR&D is to benefit both government contractors and their customer agencies by encouraging the contractors to engage in research that is likely to benefit multiple contracts, both governmental and commercial. Spreading IR&D costs across multiple contracts encourages general research that enables the contractor to innovate, to maintain a high level of technological sophistication, and ultimately to improve the products it offers the government. As the Department of Defense has explained, providing financial support for IR&D serves several Departmental goals, including creating "an environment that encourages DoD contractors to expand knowledge in mathematics and science, improve technology in areas of interest to the Department of Defense, and enrich and broaden the spectrum of technology available to the Department of Defense." Dep't of Def. Directive No. 3204.1, at 3 (May 10, 1999).

Second, the result of requiring IR&D costs to be borne by a contract for which the research and development work in question is deemed necessary could have the perverse effect of charging all of the research and development costs for a proposed product line against the first contract for the products in that line, whether the contract is governmental or commercial. That approach would either disproportionately burden the contract that happened to be first in line or ensure that the first contract would be a losing one. For research that, by hypothesis, benefits multiple potential contracts, both

commercial and governmental, allocating general research and development costs in that manner is not sensible as a policy matter.

Accordingly, the government's policy arguments do not persuade us that the phrase "required in the performance of a contract" in the definition of IR&D costs should not be accorded the same meaning as the identical phrase in the definition of B&P costs. Because the research and development costs at issue in this case were related to the Mitsubishi contract but were not specifically required by that contract, we uphold the trial court's decision that those costs were indirect IR&D costs within the meaning of the pertinent regulatory provisions.

<u>AFFIRMED</u>.